717 N.W.2d 166 (2006)
2006 WI 84
Jim HILTON, Acting on Behalf of PAGES HOMEOWNERS' ASSOCIATION, Plaintiff-Respondent-Petitioner,
v.
DEPARTMENT OF NATURAL RESOURCES, Defendant-Appellant.
No. 2003AP3353.
Supreme Court of Wisconsin.
Argued November 9, 2005.
Decided July 6, 2006.
*168 For the plaintiff-respondent-petitioner there were briefs by Peter John Hoeper and Hoeper Law Offices, Waupun, and oral argument by Peter John Hoeper.
For the defendant-appellant the cause was argued by Joanne F. Kloppenburg, Assistant Attorney General, with whom on the briefs was Peggy A. Lautenschlager, Attorney General.
An amicus curiae brief was filed by John A. Kassner and Murphy Desmond S.C., Madison, on behalf of the Wisconsin Builders Association, and there was oral argument by John A. Kassner.
An amicus curiae brief was filed by Thomas D. Larson and Debra P. Conrad, Madison, on behalf of the Wisconsin Realtors Association.
An amicus curiae brief was filed by William P. O'Connor, Mary Beth Peranteau, *169 and Wheeler, Van Sickle & Anderson, S.C., Madison, on behalf of the Wisconsin Association of Lakes.
¶ 1 N. PATRICK CROOKS, J.
Jim Hilton, acting on behalf of the Pages Homeowners' Association (Association) appeals an unpublished decision of the court of appeals, reversing the decision of the circuit court which had modified the order of the Administrative Law Judge (ALJ)[1] requiring that the Association reduce the number of boat slips on its pier. There are three principal issues on appeal: What standard of review must a court apply to an ALJ decision that has been expressly adopted by the Department of Natural Resources (DNR) on a matter in that agency's particular area of expertise? Whether the decision of the DNR, adopting that of the ALJ, that a 226-foot, 11-slip pier is the most that "reasonable use" allows, is reasonable, consistent with applicable law, and supported by substantial evidence in the record? Finally, if the DNR decision[2] that the Association must reduce the number of slips from its current 22 to 11 is valid, whether the enforcement of that determination would constitute a taking of private property for public use under the state[3] and federal[4] constitutions, and therefore require the state to pay just compensation?
¶ 2 We affirm the decision of the court of appeals. We hold that because the DNR did not appeal the decision of the ALJ, and adopted by rule the decision as its own, the decision is entitled to great weight deference, because it is a decision within the DNR's area of expertise and satisfies the other necessary criteria. Furthermore, the decision of the DNR was reasonable, consistent with applicable law, and supported by substantial evidence in the record. The decision of the DNR was neither arbitrary nor capricious. Finally, because the issue of whether the reduction in the number of boat slips allowed on the Association pier is an unconstitutional taking is not properly before this court, we decline to address it.

I
¶ 3 The relevant facts are not in dispute. Nelson Page (Page) owned a 77-foot wide riparian lot on Green Lake, as well as nearby nonriparian land. In 1958 and again in 1961, Page subdivided, platted, and recorded the nonriparian land, developed a subdivision, and sold the lots. At the same time, Page also conveyed various undivided 1/38 interests in the riparian lot and a common pier to those buyers who purchased and built on the nonriparian land. The Association, an unincorporated entity, was established in 1966. Association membership consists of those persons who each own the 1/38 interest in the riparian lot.
¶ 4 Since 1966, the Association has placed an unpermitted pier, with various *170 numbers of boat slips, extending from the riparian lot into Green Lake. In 1966, the pier had six boat slips. In 1974-76, the number of slips increased to 11. In 1990, the number of slips had increased to 20. The slips decreased to 16 in 1994-95 then rose to 21 by 2000. Currently, the pier is 249 feet long, 3 feet wide, and contains 22 boat slips. In 1993, when Green Lake County adopted an antipyramiding ordinance there were 17 slips on the pier.[5]
¶ 5 The Association first contacted the DNR regarding its pier in 1993, at which point Association representatives were told that although the pier's size and density were both excessive under DNR "reasonable use" guidance, the DNR would not commence an enforcement action unless a complaint was received.
¶ 6 In 1997, the DNR received a complaint about possible riparian zone conflicts involving the Association's pier. When the conservation warden inspected the site, an Association member informed him that the Association was interested in increasing the number of slips on the pier above the existing 22.[6] The warden explained that the Association would need a permit to do so, and that the DNR would consider reasonable use, cumulative impact, and other public interest factors in deciding whether to issue a permit.
¶ 7 In 1998, the Association asked the DNR if it needed a permit to replace its existing pier with two piers containing 14 slips each. In response to that proposal, and repeatedly over the next four years, DNR staff advised the Association of the DNR's position: that the existing pier and any proposed expansion exceeded Wis. Stat. § 30.13 (1997-98) standards to maintain a pier without a permit; that the Association must apply for a permit if it wished to maintain the current pier or any pier exceeding the § 30.13 (1997-98) standards; if the Association did not reduce the pier to meet the standards, or submit a permit application, the DNR would seek an abatement hearing under § 30.03 (1997-98).[7]
¶ 8 In 1998 and in 2000, the DNR received further complaints about the pier. By June 2001, having still not received a pier permit application, pursuant to its enforcement powers under Wis. Stat. § 30.03 (2001-02),[8] the DNR requested an abatement *171 hearing. Going into the abatement hearing, it was the DNR's recommendation that six slips represented the "reasonable use" that the Association pier could legally maintain without a permit.
¶ 9 In May 2002, all Association members but one submitted an application for a pier permit. The abstaining member opposed the application. Because the Association is an unincorporated entity, it does not have the authority to act on behalf of its members unless the members are unanimous. The DNR's policy is that it does not have a complete application for which it can grant a permit unless all owners apply.
¶ 10 The abatement hearing began on August 27, 2002, and testimony ensued for three days. Administrative Law Judge Jeffrey D. Boldt issued his decision in the abatement action on November 22, 2002, and determined that the existing pier violated public rights in exceeding the "reasonable use" threshold, negatively impacted the aquatic habitat, and created a safety hazard. After considering both the rights of riparians and the rights of the public, ALJ Boldt determined that the Association should be limited to a 226-foot pier with no more than 11 slips. Eleven slips also happened to be the number he had concluded represented the "historic use" of the pier.
¶ 11 On December 17, 2002, the Association petitioned for judicial review in the circuit court of the DNR decision. The circuit court found that the DNR's determination of the historic use of the pier at 11 slips was arbitrary, without rational basis, and without sufficient basis in the record. The circuit court determined that a better historic use date was 1993, when the antipyramiding ordinance went into effect. At that time there were 17 slips on the pier. Therefore, the circuit court set the number of allowable slips at 17. The DNR appealed.
¶ 12 The court of appeals reversed the circuit court. In an order dated August 18, 2004, the court of appeals determined that the circuit court had applied an improper standard of review and substituted its judgment for the decision adopted by the DNR. The court of appeals, therefore, reinstated that determination. The Association appealed, and this court granted its petition for review.

II
¶ 13 The parties disagree as to the appropriate standard of review a court should apply to an ALJ determination that has been expressly adopted by the DNR. The Association suggests that the determinations of the ALJ should be reviewed de novo, because the DNR failed to employ its expertise in evaluating the ALJ decision. The DNR maintains that the decision is entitled to great weight deference. We agree with the DNR.
¶ 14 In this case, we review the ALJ's determination as a decision of the DNR. See Borsellino v. DNR, 2000 WI App 27, ¶ 5, 232 Wis.2d 430, 606 N.W.2d 255 (citing Sea View Estates Beach Club, Inc. v. DNR, 223 Wis.2d 138, 146-47, 588 N.W.2d 667 (Ct.App.1998)). We do so because "the DNR did not petition for judicial review of the ALJ's decision, and adopted the decision as its own pursuant to § 227.46(3)(a) Stats.,[9] and Wis. Adm.Code § NR 2.155(1)." Borsellino, 232 Wis.2d *172 430, ¶ 5, 606 N.W.2d 255 (footnote omitted). Wisconsin Admin. Code § NR 2.155(1) provides, in pertinent part, "The administrative law judge shall prepare findings of fact, conclusions of law and decision subsequent to each contested case heard. Unless the department petitions for judicial review as provided in § 227.46(8), Stats., the decision shall be the final decision of the department...." Wis. Admin. Code § NR 2.155(1) (Sept., 1986). In this case the DNR chose not to appeal the ALJ's decision, "thereby making the ALJ decision its own under its own rule." Sea View, 223 Wis.2d at 147, 588 N.W.2d 667. Therefore, because the DNR has expressly adopted the ALJ decision, the ALJ decision should be afforded the same deference afforded the agency. Id. at 146-47, 588 N.W.2d 667.
¶ 15 When an appeal is taken from a circuit court order reviewing an agency decision, we review the decision of the agency, not the circuit court. Clean Wisconsin v. Pub. Serv. Comm'n, 2005 WI 93, ¶ 36, 282 Wis.2d 250, 700 N.W.2d 768. The DNR's decision consisted of both findings of fact and conclusions of law. "We apply different standards of review to agency conclusions of law and agency findings of fact." Borsellino, 232 Wis.2d 430, ¶ 6, 606 N.W.2d 255 (citation omitted). Great weight deference is applied to an agency's legal conclusions when:
"(1) the agency was charged by the legislature with the duty of administering the statute; (2)[ ] the interpretation of the statute is one of long-standing; (3)[ ] the agency employed its expertise or specialized knowledge in forming the interpretation; and (4)[ ] the agency's interpretation will provide uniformity and consistency in the application of the statute."
Clean Wisconsin, 282 Wis.2d 250, ¶ 39, 700 N.W.2d 768 (citations omitted). Further "the correct test is whether the agency `has experience in interpreting [the] particular statutory scheme' at issue." Id., ¶ 40, 700 N.W.2d 768.
¶ 16 In reviewing agency findings of fact, we apply the "`substantial evidence' standard." Borsellino, 232 Wis.2d 430, ¶ 7, 606 N.W.2d 255 (citation omitted). Wisconsin Stat. § 227.57(6) requires the court to set aside or remand an agency action "if the agency's decision depends on any findings of fact not supported by substantial evidence in the record." Borsellino, 232 Wis.2d 430, ¶ 7, 606 N.W.2d 255. "Substantial evidence does not mean a preponderance of the evidence." Madison Gas & Elec. Co. v. Pub. Serv. Comm'n, 109 Wis.2d 127, 133, 325 N.W.2d 339 (1982). Instead, the test is whether, after considering all the evidence of record, reasonable minds could arrive at the same conclusion. Id.
¶ 17 Because we conclude this is a decision of the DNR, and that the requirements set forth in Sea View and Roehl Transportation v. Div. of Hearings & Appeals, 213 Wis.2d 452, 458, 570 N.W.2d 864 (Ct.App.1997) are met, the DNR's legal conclusions should be granted great weight deference, and the factual findings should be evaluated using the substantial evidence test. Under great weight deference, we will sustain an agency's interpretation, if reasonable, even if an equally reasonable or more reasonable interpretation is offered. Therefore, we will affirm the decision of the DNR if it conforms to applicable law and is supported by substantial evidence from which reasonable minds could arrive at the same conclusion. See Hixon v. Pub. Serv. Comm'n, 32 Wis.2d 608, 615-16, 146 N.W.2d 577 (1966).

III
¶ 18 Our first inquiry is to examine applicable law to determine whether the *173 conclusions of the DNR are consistent with the law governing piers. When considering actions that affect navigable waters in the state, one must start with the public trust doctrine, rooted in Article IX, Section 1 of the Wisconsin Constitution.[10] Under the public trust doctrine, "the state of Wisconsin holds the beds of navigable waters in trust for all its citizens...." Hixon, 32 Wis.2d at 618, 146 N.W.2d 577 (citing Muench v. Pub. Serv. Comm'n, 261 Wis. 492, 499, 53 N.W.2d 514 (1952)).
¶ 19 The legislature has the primary authority to administer the public trust for the protection of the public's rights, and to effectuate the purposes of the trust. See State v. Bleck, 114 Wis.2d 454, 465, 338 N.W.2d 492 (1983). Even though the beds of navigable waters are held in trust, "the legislature may authorize limited encroachments upon the beds of such waters where the public interest will be served." Hixon, 32 Wis.2d at 618, 146 N.W.2d 577 (citing State v. Pub. Serv. Comm'n, 275 Wis. 112, 117, 81 N.W.2d 71 (1957)). Furthermore, under the common law, riparian rights must be reasonably exercised. Borsellino, 232 Wis.2d 430, ¶ 21, 606 N.W.2d 255 (citing Sterlingworth Condo. Ass'n v. DNR, 205 Wis.2d 710, 731, 556 N.W.2d 791 (Ct.App.1996)).
¶ 20 The legislature has delegated to the DNR the duty of enforcing the state's environmental laws. Sea View, 223 Wis.2d at 149, 588 N.W.2d 667 (citing Barnes v. DNR, 178 Wis.2d 290, 304, 506 N.W.2d 155 (1993)). Particularly relevant to this case, the legislature "has charged the DNR with regulating piers under §§ 30.12 and 30.13, and the DNR has technical expertise in regulating piers and waterways." Borsellino, 232 Wis.2d 430, ¶ 6, 606 N.W.2d 255 (citation omitted).
¶ 21 There are three policy factors identified by the legislature that the DNR must balance in enforcing environmental laws related to navigable waters: "the desire to preserve the natural beauty of our navigable waters, to obtain the fullest public use of such waters, . . . and to provide for the convenience of riparian owners."[11]Hixon, 32 Wis.2d at 620, 146 N.W.2d 577. The legislature has articulated this balancing requirement in Wis. Stat. §§ 30.12 and 30.13, disallowing any deposit or structure on the bed of navigable water that constitutes "`a material obstruction to navigation'" or is "`detrimental to the public interest.'" Id. (citation omitted). "The job of applying these two standards in each particular situation was delegated to the [DNR]." Id.
¶ 22 Under existing statutory guidelines, a riparian owner with a lot including 77 feet of shoreline would be entitled by statutory presumption to maintain a pier, without a permit:
no more than 6 feet wide, that extends no further than to a point where the water is 3 feet at its maximum depth, . . . and which has no more than 2 boat slips for the first 50 feet of riparian owner's shoreline footage and no more than one additional boat slip for each additional 50 feet of the riparian owner's shoreline. *174 Wis. Stat. § 30.12(1g)(f) (2003-04). However, the public trust analysis requires the DNR to go beyond the statutory presumption to determine what the "reasonable use" is in light of the relevant facts particular to each situation. In this case, the ALJ examined environmental impact, natural scenic beauty, historic use, safety, the statutory presumption, the absence of a permit, and the DNR's delayed enforcement, among other factors, in determining "reasonable use." There is ample evidence in the record that the ALJ considered the relevant factors in this case and weighed them appropriately in light of the public trust doctrine. We conclude, therefore, that the decision of the DNR is consistent with applicable law.

IV
¶ 23 Because we have concluded that the DNR's decision to limit the number of permissible slips was consistent with applicable law, we next turn to the DNR's specific findings of fact and conclusions of law. We must determine whether the decision is reasonable and is supported by substantial evidence in the record.
¶ 24 There are four elements of the decision, in particular, that the Association challenges: that the pier directly and cumulatively adversely impacts the aquatic habitat, that the pier presents a safety hazard, that the determination of 11 slips as the "historical use" of the pier was reasonable, and that a 226-foot pier with 11 slips is the most that can reasonably be maintained, without a permit. There is a dispute as to which elements of the decision are findings of fact versus conclusions of law.[12] We are satisfied that the first two issues are findings of fact, and the last two are conclusions of law. We will first examine the findings of fact.
¶ 25 The "substantial evidence" rule affords significant deference to an agency's factual findings. "The agency's decision may be set aside by a reviewing court only when, upon an examination of the entire record, the evidence, including the inferences therefrom, is such that a reasonable person, acting reasonably, could not have reached the decision from the evidence and its inferences." Sterlingworth, 205 Wis.2d at 727, 556 N.W.2d 791 (citing Hamilton v. DILHR, 94 Wis.2d 611, 618, 288 N.W.2d 857 (1980)). Additionally, "the weight and credibility of the evidence are for the agency, not the reviewing court, to determine." Id. (citing Bucyrus-Erie Co. v. DILHR, 90 Wis.2d 408, 418, 280 N.W.2d 142(1979)).
¶ 26 First, we will examine whether there is sufficient evidence in the record to support the DNR's finding that the Association pier, in its current form, has direct and cumulative adverse impacts to the wildlife and fish habitat in Green Lake. The area in which the Association pier is located is part of the littoral zone [13] of Green Lakethe relatively small, shallow portion of the lake. It is in these areas that aquatic plant growth can develop, providing habitat for fish and other aquatic life, stabilizing sediment, improving water quality, and providing sustenance for waterfowl, both migratory and residential.
*175 ¶ 27 Green Lake County Conservation Warden Cletus Alsteen (Warden Alsteen) testified that wild celery, upon which migratory birds feed, is limited to growth in the littoral zone. Shawn Eisch (Eisch), a DNR water management specialist, stated that the area, and the access to wild celery, is important for canvasback duck and geese migration. Eisch explained that because Green Lake is one of the last lakes in the area to freeze, it provides access to food after snow cover eliminates ground sources. Eisch also testified that it was very apparent that the pier and shading by boats was restricting growth of wild celery in the area. Both the DNR and the Association presented expert testimony that the existing pier configuration and size, as well as the parking of boats in pier slips, shades out beneficial aquatic vegetation in the littoral zone, although they disagreed about the extent of the harm.
¶ 28 Department of Natural Resources fisheries biologist, David Bartz, testified that the pier had a detrimental impact on the fish in the area. He stated that there was no question that fish habitat in the area would improve if the pier and boats in the area were removed. Finally, the ALJ heard testimony from DNR wildlife biologist James Holzwart that, to a reasonable degree of scientific certainty, allowing the pier to remain as it is will continue to have a degrading effect on the aquatic habitat. We are satisfied that there is sufficient evidence in the record to support a reasonable conclusion that aquatic life was and is harmed by the existing pier. As the court in Sterlingworth noted:
Whether it is one, nine or ninety boat slips, each slip allows one more boat which inevitably risks further damage to the environment and impairs the public's interest in the lakes. The potential ecological impacts include direct impacts on the water quality and sediment quality alteration, as well as direct and indirect influences on flora and fauna. For this very reason, the consideration of "cumulative impact" must be taken into account.
Sterlingworth, 205 Wis.2d at 721, 556 N.W.2d 791.[14]
¶ 29 Next, we turn to the DNR's finding that the existing pier creates a safety hazard due to congestion and impaired visibility. Warden Alsteen testified that the west end of Green Lake, where the Association pier is located, is a heavy use, high boat traffic area. He expressed concerns for safety posed by the fact that the Association pier extends beyond the line of navigation, and is one of the longer privately-owned piers on the western side of Green Lake. Warden Alsteen also expressed concern for safety of swimmers and boaters as a result of the design and congestion of the slips on the Association's pier, which causes limited visibility for boat operations.
*176 ¶ 30 In addition, Warden Alsteen testified that the configuration of slips required a boat operator entering the area of the Association pier to maneuver the boat past neighboring piers and boats and turn to enter the slip, as very few slips at the Association pier have a straight-line approach. He further stated that even experienced boat operators might have trouble maneuvering in limited space, and such maneuverability becomes even more difficult when compounded by waves and boat wakes. In addition, the ALJ heard testimony that the positioning of the pier and slips may necessitate incursion into neighboring riparian areas while navigating into and away from the pier.
¶ 31 The ALJ, uniquely in a position to weigh the credibility of the testimony of the witnesses, determined that the greater weight of the credible evidence demonstrated that the existing pier constitutes a hazard to navigation because of its length, configuration, and the large number of boats navigating in a relatively narrow access area. There is substantial evidence in the record to support the finding that the Association pier creates a safety hazard.
¶ 32 Next we turn to the conclusions of law, to which we give great weight deference. Under great weight deference, if the conclusions of law are reasonable, are based upon substantial evidence in the record, and are consistent with the applicable law, we will uphold the decision of the agency.
¶ 33 The Association first urges that the DNR's determination that 11 slips constituted the historic use of the pier was not reasonable. In contrast to the DNR's conclusion, the Association maintains that the circuit court's determination of 17 slips as the proper historic use number, dating to the antipyramiding ordinance, is reasonably supported by the evidence.
¶ 34 The Association's position is based upon the assertion that the ALJ ignored the legal methodology for establishing historic use with reference to actual events, as articulated in Sea View, and what it claims is the legal requirement enunciated in Sterlingworth to consider similar pier usages on Green Lake. The Association misinterprets the holdings in those cases.
¶ 35 Sea View and Sterlingworth suggest that historical use, however it is determined, is one of the factors that the ALJ may weigh in balancing the private rights and public interests at stake in riparian rights/public trust doctrine cases like this one. See Sea View, 223 Wis.2d at 155-56, 588 N.W.2d 667; Sterlingworth, 205 Wis.2d at 733, 556 N.W.2d 791. The cases do not establish any set definition of historical use or any hard and fast methodology for determining it. The court of appeals in Sea View and Sterlingworth did not even use the phrase "historic use" (or "historical use"), let alone define it.
¶ 36 To the extent that the Association is suggesting that historic use must be based on something like passage of an ordinance or DNR contact, that suggestion is without solid underpinnings in the law, and is not required by public policy considerations. In fact, in Borsellino, a case decided shortly after Sea View and Sterlingworth, the court of appeals explained that, under Sea View, "an ALJ may review local ordinances in making a permit determination under § 30.12(2), Stats., but an ALJ is not required to do so." Borsellino, 232 Wis.2d 430, ¶ 10, 606 N.W.2d 255 (citation omitted).
¶ 37 The DNR found that the evidence showed the following maximum number of members and/or slips in the following years:

*177
 Years: Numbers:
 1966-68 5-6
 1971 8
 1972-74 10
 1974-76 11
 1978 15
 1981 17
 1988 19
 1990 22
 1991 19
 1994-95 16
 2000 21
 Present 22

Considering these facts, the ALJ made a determination to use 11 slips as the "historic use" factor, in that "no more than 11 slips were placed at the site for the first 10 years that the Association placed a pier." Although he acknowledged that "the number of slips has increased beyond 11 after 1976," he did not determine that the increase reflected the "`historic use' but rather the Association's continuing effort to pack as many boats as possible into its small riparian zone to accommodate Association members."
¶ 38 The Association and the circuit court found this conclusion to be unreasonable and arbitrary. We disagree. While the circuit court's conclusions were reasonable, arguably even more reasonable than that of the DNR, the standard of review requires us to decide differently. Certainly, the DNR could have reasonably selected a different number of slips as determinative of the historic use factor, based on the facts of record, but the DNR did not. The Association's argument is apparently that historic use had to be considered to be the high end of the various levels of use through the last 40 years, but that argument is no more reasonable or accurate than what the DNR did in light of the evidence. It would not have been unreasonable, perhaps, if the DNR had selected the original number of slips as the historic use. It must be kept in mind that this is not a case where the same number of slips had remained constant over a long period of time. Rather, it is a case where the number of slips started out very small and slowly increased over four decades, sometimes even decreasing in certain years. Thus, the DNR's decision to choose some sort of midpoint as historic use was both supported by substantial evidence in the record and was a reasonable determination.[15]
¶ 39 We now turn to the DNR's conclusion that an unpermitted reasonable use for the Association is a 226-foot pier with 11 boat slips, which would adequately balance riparian rights with the public interest.
¶ 40 In Sterlingworth, the court of appeals noted that the common law requires "reasonable use" by riparian owners to be determined by "`the extent and capacity of the [lake], the uses to which it has been put, and the rights that other riparian owners on the same [lake] also have.'" Sterlingworth, 205 Wis.2d at 731, 556 N.W.2d 791, (citing Apfelbacher v. State, 167 Wis. 233, 239, 167 N.W. 244 (1918)). Such an inquiry is a highly fact-specific *178 one, and determinations are made on a case-by-case basis.
¶ 41 In this case, the decision of the DNR that the limit of "reasonable use" by the Association was a 226-foot, 11 slip pier was reasonable, consistent with applicable law, and supported by substantial evidence in the record. The Association was entitled to no more than reasonable use, without a permit, for its pier. Riparian rights have always been qualified by reasonable use and subordinate to public rights. It is evident from the record that the ALJ considered the convenience of riparians, environmental impacts, natural scenic beauty, historic use, safety, the statutory presumption in Wis. Stat. § 30.12(1g)(f)(2003-04), the absence of a permit, and the DNR's delayed enforcement. While not the only reasonable conclusion, the ALJ weighed all of the relevant factors in light of the public trust doctrine and arrived at a conclusion that is reasonable and supported by substantial evidence in the record. Therefore, applying great weight deference, we affirm the ALJ's decision and, thus, the decision of the DNR.

V
¶ 42 Finally, we turn to the Association's argument that the abatement of the present number of boat slips constitutes an unconstitutional taking. Because neither party appealed that portion of the circuit court's decision, the issue is not properly before this court. We decline, therefore, to address it.

VI
¶ 43 We hold that because the DNR did not appeal the decision of the ALJ, and adopted by rule the decision as its own, the determination is entitled to great weight deference, since it is a decision within the DNR's area of expertise and satisfies the other necessary criteria. Furthermore, the decision of the DNR was reasonable and supported by substantial evidence in the record and was consistent with applicable law. The decision of the DNR was neither arbitrary nor capricious. Finally, we determine that the issue of whether the reduction in the number of boat slips allowed on the Association pier is an unconstitutional taking is not properly before this court. We decline to address it further.
The decision of the court of appeals is affirmed.
¶ 44 SHIRLEY S. ABRAHAMSON, C.J. (concurring).
I join the majority opinion.
¶ 45 I write separately to point out that the standard of review of and deference to a decision of the Division of Hearings and Appeals, discussed by the majority opinion at ¶¶ 13-17, was also raised in Racine Harley-Davidson, Inc. v. State, Division of Hearings & Appeals, 2006 WI 86, ___ Wis.2d ___, 717 N.W.2d 184.
¶ 46 Racine Harley-Davidson and the present case were both argued in November 2005. In Racine Harley-Davidson the court requested supplemental briefing of the issue of the standard of review. Part I of the Racine Harley-Davidson opinion, ___ Wis.2d ___, ¶¶ 8-58, discusses in detail the standard of review of (including deference to) decisions issued by the Division of Hearings and Appeals, including the cases upon which the present decision relies.
¶ 47 DAVID T. PROSSER, J. (concurring).
This case involves much more than the number of boat slips on a long-established pier in Green Lake County. This case epitomizes the growth of agency power, the decline of judicial power, and the tenuous *179 state of property rights in the 21st Century. I join the majority opinion because, under current law, this court is bound to uphold the decision of the administrative law judge (ALJ) even though several members of the court believe that the circuit court reached a more reasonable decision. Although reluctantly conceding the result, I write separately to offer additional perspective.

STANDARD OF REVIEW
¶ 48 In this case, the standard of review is prescribed by Wis. Stat. § 227.57(2) (2003-04):[1] "Unless the court finds a ground for setting aside, modifying, remanding or ordering agency action or ancillary relief under a specified provision of this section, it shall affirm the agency's action." (Emphasis added.) See also Wis. Stat. § 227.57(10). Pursuant to § 227.57, a court's review is confined to the record except in cases of alleged irregularities in procedure. Wis. Stat. § 227.57(1).
¶ 49 The court may review the agency's procedure, its interpretation of law, and its determinations of fact. Wis. Stat. § 227.57(3).
¶ 50 In review, however, the court must grant great weight deference to an agency's interpretation of law in situations where (1) the agency is charged by the legislature with the duty of administering the statute at issue; (2) the agency determination is one of long standing; (3) the agency employed its expertise or specialized knowledge in forming its interpretation; and (4) the agency's interpretation will provide uniformity and consistency in the application of the statute. See majority op., ¶ 15; UFE, Inc. v. LIRC, 201 Wis.2d 274, 284, 548 N.W.2d 57 (1996) (quoting Harnischfeger Corp. v. LIRC, 196 Wis.2d 650, 660, 539 N.W.2d 98 (1995)); Sea View Estates Beach Club, Inc. v. DNR, 223 Wis.2d 138, 148-49, 588 N.W.2d 667 (Ct.App.1998). "If the foregoing criteria are met, we will sustain the agency's interpretation even if an equally or more reasonable interpretation is offered." Sea View, 223 Wis.2d at 149, 588 N.W.2d 667 (citing Roehl Transp., Inc. v. Wis. Div. of Hearings & Appeals, 213 Wis.2d 452, 459, 570 N.W.2d 864 (Ct.App.1997)).
¶ 51 Once an agency's legal interpretation is entitled to great weight deference, it will be set aside or modified only if the court "finds that the agency has erroneously interpreted a provision of law and a correct interpretation compels a particular action," Wis. Stat. § 227.57(5), or if the agency's interpretation violates a constitutional provision. Wis. Stat. § 227.57(8).
¶ 52 Moving to the facts, courts apply a substantial evidence standard in reviewing an agency's findings of fact. Majority op., ¶ 16. See Wis. Stat. § 227.57(6) ("The court shall ... set aside agency action ... if it finds that the agency's action depends on any finding of fact that is not supported by substantial evidence in the record"). Substantial evidence "is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Sterlingworth Condo. Ass'n, Inc. v. DNR, 205 Wis.2d 710, 727, 556 N.W.2d 791 (Ct. App.1996) (emphasis added). It does not mean a preponderance of the evidence. Madison Gas & Elec. Co. v. Pub. Serv. Comm'n, 109 Wis.2d 127, 133, 325 N.W.2d 339 (1982). The court may set aside the agency's decision "only when, upon an examination of the entire record, the evidence, including the inferences therefrom, is such that a reasonable person, acting *180 reasonably, could not have reached the decision from the evidence and its inferences." Sterlingworth, 205 Wis.2d at 727, 556 N.W.2d 791 (citing Hamilton v. DILHR, 94 Wis.2d 611, 618, 288 N.W.2d 857 (1980)) (emphasis added).

COMMENTARY ON JUDICIAL REVIEW OF AGENCY DECISIONS
¶ 53 These standards of review frequently put reviewing courts in a straitjacket and are sometimes at odds with the role of courts.
¶ 54 First, the supreme court is the state's preeminent law-developing court. When the supreme court grants great weight deference to an agency's interpretation of law, however, it ceases to be "preeminent." This is contrary to the fundamental role of the judiciary as articulated in Marbury v. Madison: "It is emphatically the province and duty of the judicial department to say what the law is." Marbury, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803). When the Wisconsin Supreme Court elects to hear only ten percent of the cases presented to it for review, the public expects and deserves that the court "take[ ] . . . case[s] to decide the substantive issues presented [and provide meaningful analysis and guidance on important issues], not to avoid deciding them by judicially created avoidance doctrines." See Patience D. Roggensack, Elected to Decide: Is the Decision-Avoidance Doctrine of Great Weight Deference Appropriate in this Court of Last Resort?, 89 Marq. L.Rev. 541, 541, 544 (2006).
¶ 55 In these situations, it is not enough for this court to perceive a more reasonable interpretation of a statute than the agency. When deference is invoked,
[t]here is no discussion of the facts and how the relevant statutes bear on them. There is no explanation of why the agency decision accords with the intent of the legislature in enacting the law under consideration. Therefore, there is no reasoned decision about whether the law was correctly applied or interpreted.
Roggensack, supra, at 546. The supreme court and other Wisconsin courts are expected to rationalize and rubberstamp the agency's decision unless the agency's legal interpretation is plainly wrong. The result is that many litigants have lost their right to a decision by an independent judiciary. In fact, the public's right to meaningful judicial determinations of applicable law steadily contracts as the scope of agency regulation expands. In essence, litigants lose the right to meaningful appellate review, which involves:
review of factual records . . .; extensive legal research of the laws of Wisconsin, of federal laws, and the laws of other states; careful attention to briefs and to oral arguments of the parties; thorough discussion among members of the court; and the synthesis of a written opinion that distills the facts and the law and comes to a reasoned conclusion that is both understandable and useable by the parties, other tribunals, and the public.
Roggensack, supra, at 542.
¶ 56 Second, judicial deference to administrative decisions is greater than it used to be. In reviewing a decision of the Wisconsin Tax Appeals Commission in 1977, this court stated:
The first matter to be determined on this appeal is the standard of review to be applied. In Dept. of Revenue v. Smith Harvestore Products, 72 Wis.2d 60, 240 N.W.2d 357 (1976), this court held that the question of whether facts found by an administrative commission fulfill a particular legal standard is one of law properly reviewable by this court. Moreover, while due deference must be *181 accorded an agency's application of the law to the found facts when the agency has particular competence or expertise in the matter at hand (Chevrolet Division, G.M.C. v. Industrial Comm., 31 Wis.2d 481, 488, 143 N.W.2d 532 (1966); § 227.20(2), Stats.), this court has held that such deference is not required when this court is as competent as the agency to decide the question involved. Dept. of Revenue v. Smith Harvestore Products, supra; Pabst v. Dept. of Taxation, 19 Wis.2d 313, 120 N.W.2d 77 (1963). Finally, when the material facts are not disputed, and only matters of law are in issue, this court may review the record ab initio and substitute its own judgment for that of the Commission. H. Samuels Co. v. Dept. of Revenue, 70 Wis.2d 1076, 1083-84, 236 N.W.2d 250 (1975).
Wis. Dep't. of Revenue v. Milwaukee Ref. Corp., 80 Wis.2d 44, 48, 257 N.W.2d 855 (1977).
¶ 57 In State v. Department of Industry, Labor & Human Relations, 101 Wis.2d 396, 402, 304 N.W.2d 758 (1981), the court repeated the proposition that when the facts before an agency are not in dispute, the court is "not bound by the [agency's] determination of a question of law." [2] This statement was followed by the assurance that the court "does defer to some extent to the legal construction and application of a statute by the agency." Id. (quoting Larson v. ILHR Dep't, 76 Wis.2d 595, 603, 252 N.W.2d 33 (1977), and De Leeuw v. ILHR Dep't, 71 Wis.2d 446, 449, 238 N.W.2d 706 (1976)) (emphasis added). This point/counterpoint was once typical in our case law.
¶ 58 In these older cases,[3] the court appeared to reserve the ultimate authority to interpret the law. Significantly, the phrase, "we are not bound by the agency's interpretation of law"with its admitted qualificationshas almost disappeared from judicial decisions. When this court does not reserve its authority to interpret the law, it is ratifying a decline in judicial power.
¶ 59 Third, agencies lack the same degree of political accountability as elected office holders, yet agency officials are often given substantial latitude to make law. They then turn to the courts for enforcement. When agency decisions are given great weight deference, they are expected to be upheld uncritically by elected judges. To illustrate the point, the critical statutes in this case are Wis. Stat. §§ 30.12(2) and 30.13(1) (2001-02). These broadly worded statutes include key phrases such as "detrimental to the public interest," "interfere with public rights in navigable waters," and "interfere with rights of other riparian proprietors." It is very difficult for a court to conclude that an agency's interpretation of the broad language in these statutes is erroneous or lacks a rational basis.
¶ 60 To illustrate further, in Claflin v. DNR, 58 Wis.2d 182, 206 N.W.2d 392 (1973), a property owner applied for a permit to build a boathouse. A hearing examiner recommended the permit. The Public Service Commission (predecessor to the DNR on such issues) denied the permit on a 2-to-1 vote. A circuit court *182 reversed, and then this court reversed the circuit court. We said: "Specific structures may be determined to be detrimental to the public interest on the ground that they impair natural beauty. This is a proper basis for denial of a permit." Id. at 193, 206 N.W.2d 392 (emphasis added).
¶ 61 It has long been understood that beauty is in the eye of the beholder. Under the law, however, the agency's eye for beauty is entitled to great weight deference. This brings to mind the insightful observation that: "Expert discretion is the lifeblood of the administrative process, but `unless we make the requirements for administrative action strict and demanding, expertise ... can became a monster which rules with no practical limits on its discretion.'" Transp. Oil, Inc. v. Cummings, 54 Wis.2d 256, 266, 195 N.W.2d 649 (1972) (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 167, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)).
¶ 62 Fourth, courts defer to an agency's decision in large part because of the presumed experience and expertise of the agency. This does not resolve the problem of "agencies" in conflict with each other. In this case, the "agency" entitled to great weight deference is deemed to be the Department of Natural Resources, not because the DNR actually made the decision at issue, but because the DNR automatically adopted the decision of the ALJ when it did not seek judicial review. See Wis. Admin. Code § NR 2.155(1) (Sept., 2004). The plain truth is, however, that when a rule turns an agency's inaction into the agency's "final decision," the affected litigant may never know whether the agency actually employed its expertise or not. The agency certainly could have agonized over the decision not to seek judicial review, but it could also have ignored the ALJ's decision or simply missed a filing deadline.
¶ 63 Great weight deference is given to the agency's decision, even though the decision may be sharply at odds with the position the agency took before the ALJ. In this matter the DNR's position was given no deference by the ALJ at the abatement hearing. Moreover, if the DNR had decided to seek judicial review, it is not clear which "agency"the DNR or the Division of Hearings and Appeals (DHA)would have been given deference, or whether any agency would have been given deference. If the DNR and the ALJ in the DHA had disagreed about the proper interpretation of the law, there would be little reason to believe that either interpretation would provide uniformity and consistency in the application of the statutea prerequisite to great weight deference.
¶ 64 Fifth, uniformity and consistency may not be achievable. Compare the following cases:
1. Hilton v. DNR. In the present case, the Green Lake riparian lot has 77 feet of shoreline and is owned by 38 landowners who have built and maintained a pier on the riparian lot. Currently, the pier is 249 feet long, 3 feet wide, and contains 22 boat slips. The DNR brought an action to reduce the size of the pier. After an abatement hearing, the ALJ ordered that the pier be reduced in size to 226 feet with no more than 11 slips. At one point, the DNR was advocating only 6 slips.
2. Sea View Estates Beach Club v. DNR. In Sea View, the riparian lot had 60 feet of shoreline with a 215-foot pier with 23 boat slips. Sea View, 223 Wis.2d at 144, 161, 588 N.W.2d 667. At a permit hearing, the DNR recommended a 190-foot pier with 24 boat slips. Id. at 144, 588 N.W.2d 667. The ALJ concluded the riparian landowners should be issued a permit authorizing a *183 110-foot pier with 12 boat slips. Id. at 145, 588 N.W.2d 667. The DNR adopted the ALJ's decision. Id.

3. Borsellino v. DNR. In Borsellino the riparian lot had 12 feet of shoreline with a 78-foot pier. Borsellino, 2000 WI App 27, ¶ 2, 232 Wis.2d 430, 606 N.W.2d 255. Borsellino challenged the pier as an unreasonable use of the lot. Id., ¶ 3, 606 N.W.2d 255. An ALJ decided the pier exceeded reasonable use for the lot and ordered it removed. Id. The landowners of the 12-foot lot applied for a permit for a 96-foot-long pier, generally 6 feet wide, with an 8.5-foot wide boatlift attached. Id. The ALJ granted the permit and the DNR adopted the ALJ's decision. Id., ¶ 4, 606 N.W.2d 255.
4. Sterlingworth Condo. Ass'n, Inc. v. DNR. Sterlingworth owned a riparian lot with 331 feet of lakeshore on Mill Lake and 429 feet on Sterlingworth Bay. Sterlingworth, 205 Wis.2d at 718, 556 N.W.2d 791. Sterlingworth sought a permit for a pier along each section of shoreline with a total number of 34 boat slips (15 slips on Mill Lake and 19 slips on Sterlingworth Bay). Id. The DNR issued a permit for 25 boat slips. Id. at 719 n. 1, 556 N.W.2d 791. Sterlingworth petitioned for administrative review and the ALJ upheld the DNR's determination that 25 boat slips were appropriate. Id. at 719, 556 N.W.2d 791.
5. Nagawicka Bay Sailing Club Owners Ass'n, Inc. v. DNR. The Nagawicka Bay Sailing Club Owners Association owned a riparian lot with 56 feet of shoreline and a pier 3.5 feet wide, consisting of two "Ts" of approximately 33 feet in width. Nagawicka Bay Sailing Club Owners Ass'n, Inc., No.1996AP2805, 213 Wis.2d 485, 570 N.W.2d 911, unpublished slip op. at 570 (Wis.Ct.App. Sept. 10, 1997). The pier was designed to accommodate eight boats. The DNR filed an action to have the pier removed. The ALJ concluded the Nagawicka Bay Sailing Club Owners Association could build a pier 44 feet long provided it had no more than one "T" which did not exceed 33 feet in width.
¶ 65 The seamless "consistency" in these cases is not self-evident. Moreover, the statutory law can change over time,[4] and the ability of local governments to adopt their own ordinances under Wis. Stat. § 30.13(2),[5] or, conversely, not adopt any ordinance, almost assures that the regulation of "wharves, piers and swimming rafts" will not be uniform.[6]
¶ 66 Finally, the agency has been given enormous latitude in finding facts. Finding facts involves more than determining the existence of A, B, and C. Finding facts involves the authority to select Fact B for emphasis, and deemphasize Fact C as unimportant. In this case, the majority joins the "agency" in emphasizing the value of *184 wild celery over the importance of a longstanding pier that has not had as few as 11 boat slips since 1976.
¶ 67 From time to time courts can overstep their bounds, but when they are at their best, courts serve as the great protector of people's rights to life, liberty, and property. The legislature and the courts have worked in tandem to dilute the role of the courts in protecting substantial rights and interests in agency cases. Property rights become tenuous when they are subject to largely unreviewable ad hoc decision-makingeven by well-qualified, dedicated administrative officials.
¶ 68 I respectfully concur with the hope that this commentary will help to generate discussion of current law.
¶ 69 I am authorized to state that Justices JON P. WILCOX and PATIENCE DRAKE ROGGENSACK join this opinion.

NOTES
[1] The Administrative Law Judge (ALJ) was acting in his capacity as a hearing officer or examiner for the State of Wisconsin Division of Hearings and Appeals (DHA). The DHA and the Department of Natural Resources (DNR) have authority under Wis. Stat. §§ 30.03(4)(a)(2001-02) and 227.43(1)(b)(2001-02), as noted in the findings of fact, to order removal of structures which violate Wis. Stat. ch. 30 (2001-02). We are satisfied that the statutes permit an abatement action as was done here.
[2] As we determine infra, ¶ 14, the DNR expressly adopted the decision of the ALJ, and the DHA, thereby making it the decision of the DNR. We will, therefore, refer to the ALJ's findings of fact, conclusions of law, and order as those of the DNR.
[3] Wis. Const. art. I, § 13.
[4] U.S. Const. amends. V and XIV, § 1.
[5] Pyramiding is the use of riparian lots to provide lake access for back lot nonriparian owners. Green Lake County Zoning Ordinance # 146-76, § 4.8 RC Recreation District (C)(19)(2003) provides, in relevant portion:

The related back-lot development shall be contiguous to the access site/lot, and all lands within the back lot development shall be contiguous to each other. As used in this section, the term "contiguous" shall mean: In actual contact with or touching, a sharing of a common boundary. For example, but not in limitation of the foregoing, a back lot development that is separated from an access site/lot by a road (whether public or private) is not contiguous to the access site/lot, and would not satisfy the requirements of this section.
Ordinance # 146-76, § 4.8 RC Recreation District (c)(19) (2003)(emphasis in original).
[6] Green Lake County Conservation Warden Cletus Alsteen (Warden Alsteen) testified before the ALJ that although an Association representative had claimed, in a telephone conversation, that the Association pier had 22 slips in 1997, upon inspection of the pier, Warden Alsteen only found 18 slips.
[7] We note that the DNR recently adopted new rules regarding the regulation of piers. Included in these rules is a provision to "grandfather" in existing piers too big to qualify for an exemption, up to a certain size. It is unclear whether the Association pier would be within the category of piers eligible for "grandfathering." We also note that there is an effort by several legislators to set standards on piers, different from those of the DNR.
[8] All subsequent references to the Wisconsin Statutes are to the 2001-02 version unless otherwise indicated.
[9] Wisconsin Stat. § 227.46(3) provides, in pertinent part: "With respect to contested cases except a hearing or review assigned to a hearing examiner under § 227.43(1)(bg), an agency may by rule or in a particular case may by order: (a) Direct that the hearing examiner's decision be the final decision of the agency...." Wis. Stat. § 227.46(3). The ALJ was the "hearing examiner" in the present case.
[10] Article IX, Section 1 states in relevant part: "The state shall have concurrent jurisdiction on all rivers and lakes bordering on this state so far as such rivers or lakes shall form a common boundary to the state and any other state or territory now or hereafter to be formed, and bounded by the same...." Wis. Const. art. IX, § 1.
[11] Hixon was a case involving the Public Service Commission (PSC). Hixon v. Pub. Serv. Comm'n, 32 Wis.2d 608, 146 N.W.2d 577 (1966). The PSC previously had the duties to enforce environmental laws relating to navigable waters now assigned to the DNR.
[12] The DNR argues that all four elements are findings of fact that should be affirmed unless clearly erroneous. The ALJ, too, includes in his findings of fact section elements that seem to be conclusions of law. The last two determinations required the ALJ to adjudge reasonableness; therefore, we determine that those are conclusions of law. The determination of what is a finding of fact and what is a conclusion of law is often a confusing and difficult one.
[13] A littoral zone is the shore area or shallower zone of a lake.
[14] The court of appeals in Sterlingworth Condominium Association v. DNR, 205 Wis.2d 710, 730, 556 N.W.2d 791 (Ct.App.1996) went on to quote the supreme court's decision in Hixon, in which this court stated:

A little fill here and there may seem to be nothing to become excited about. But one fill, though comparatively inconsequential, may lead to another, and another, and before long a great body of water may be eaten away until it may no longer exist. Our navigable waters are a precious natural heritage; once gone, they disappear forever. Although the legislature has constitutionally permitted some structures and deposits in navigable waters, it permitted them under § 30.12(2)(a), Stats., only if the Public Service Commission [now the DNR] found that "such structure does not materially obstruct navigation ... and is not detrimental to the public interest."
Hixon, 32 Wis.2d at 631-32, 146 N.W.2d 577.
[15] The Association urges that the decision to pin the historical use at 11 slips was without rational basis and arbitrary, yet fails to develop the argument to overturn the decision based on an arbitrary or capricious analysis. When we look at arbitrary or capricious action of an agency, we determine it can be said to have occurred when "`such action is unreasonable or does not have a rational basis. Arbitrary action is the result of an unconsidered, wilful and irrational choice of conduct and not the result of the "winnowing and sifting" process.'" Hixon, 32 Wis.2d at 630-31, 146 N.W.2d 577 (citation omitted) (footnote omitted). In other words, "[w]hen applying the arbitrary and capricious standard, we determine whether the agency's action had a rational basis, not whether the agency acted on the basis of factual findings." Sterlingworth, 205 Wis.2d at 730, 556 N.W.2d 791. Clearly, under this standard, the ALJ had a rational basis for his determination.
[1] All references to the Wisconsin Statutes are to the 2003-04 version unless otherwise indicated.
[2] See also City of La Crosse v. DNR, 120 Wis.2d 168, 179, 353 N.W.2d 68 (Ct.App. 1984) ("We are not bound by an agency's conclusions on matters of law.").
[3] See, e.g., Am. Motors Corp. v. LIRC, 119 Wis.2d 706, 710, 350 N.W.2d 120 (1984) ("[Q]uestions of law are always reviewable by this court. Although this court is not bound by an agency's conclusions of law, we hesitate to substitute our judgment for that of the agency on a question of law if the agency's conclusion has a rational basis.") (citation omitted).
[4] The majority opinion, ¶ 22, quotes from Wis. Stat. § 30.12(1g)(f) (2003-04). However, subsection (1g) was not adopted by the legislature until 2004, after both the ALJ and the circuit court had rendered their decisions. See 2003 Wis. Act 118, § 22 (effective Feb. 6, 2004).
[5] The "agency"whatever it iswill be given great weight deference when it answers the legal question whether the local ordinance is "not inconsistent with" § 30.13.
[6] Petitioner effectively demonstrates inconsistencies between the ALJ's decision in this case and the decision in Sterlingworth Condominium Association, Inc. v. DNR, 205 Wis.2d 710, 556 N.W.2d 791 (Ct.App.1996) (history of existing structure), and Sea View Estates Beach Club, Inc. v. DNR, 223 Wis.2d 138, 588 N.W.2d 667 (Ct.App.1998) (number of boats moored at pier at the time of adoption of local pyramiding ordinance).