**COURT OF APPEALS
DECISION
DATED AND FILED**

**November 19, 2020**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No. 2020AP99**

**STATE OF WISCONSIN**

Cir. Ct. No. 2018CV3366

**IN COURT OF APPEALS
DISTRICT IV**

MARK S. DIAMOND,

    PETITIONER-APPELLANT,

  V.

OFFICE OF THE COMMISSIONER OF INSURANCE,

    RESPONDENT-RESPONDENT.

APPEAL from an order of the circuit court for Dane County: JOSANN M. REYNOLDS, Judge. *Affirmed*.

Before Blanchard, Kloppenburg, and Graham, JJ.

¶1     KLOPPENBURG, J.  Mark Diamond appeals an order affirming a decision of the Wisconsin Office of the Commissioner of Insurance.[1]  The Commissioner determined that Diamond violated various statutory and regulatory provisions that govern the conduct of insurance intermediaries.[2]  Specifically, as pertinent to the issues raised on appeal, the Commissioner determined that Diamond, an insurance intermediary:  (1) advertised a free retirement workshop that misled Wisconsin consumers by implication and omission in violation of WIS. STAT. § 628.34(1)(a) (2017-18) and WIS. ADMIN. CODE § Ins 2.16(5)(a) (through October 2020);[3] and (2) recommended an insurance product transaction without "reasonable grounds to believe that the recommendation [was] suitable for the consumer" in violation of WIS. STAT. § 628.347(2)(a).  As sanctions, the Commissioner ordered that Diamond pay a forfeiture and restitution and revoked his nonresident insurance agent license.  The circuit court affirmed the Commissioner's decision except that it reduced the forfeiture imposed.

¶2     On appeal, Diamond argues that the Commissioner erred in determining that the advertisement was misleading and that Diamond made an unsuitable recommendation, that the Commissioner improperly imposed the

---

[1] We will refer to the Wisconsin Office of the Commissioner of Insurance as OCI when referencing actions taken by that agency prior to the issuance of the decision at issue, and as the Commissioner when referencing the decision issued by the individual who heads the agency.

[2] An "insurance intermediary," commonly referred to as an agent, is a person who engages or assists another in "[s]olicit[ing], negotiat[ing] or plac[ing] insurance or annuities on behalf of an insurer or a person seeking insurance or annuities" or who "[a]dvises other persons about insurance needs and coverages." WIS. STAT. § 628.02(1)(a) (2017-18).  Diamond does not dispute that he at pertinent times was an insurance intermediary covered by the statutes and regulations at issue.

[3] All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.  All references to the Wisconsin Administrative Code are to the August 2020 version unless otherwise noted.

2

forfeiture even as reduced by the circuit court, and that the Commissioner's calculation of restitution was not supported by substantial evidence in the record.[4] We conclude that substantial evidence supports the Commissioner's determinations of violations consistent with the applicable statutes and that Diamond fails to show that the Commissioner or the circuit court improperly imposed the reduced forfeiture or that substantial evidence does not support the Commissioner's calculation of restitution. Accordingly, we affirm.

**BACKGROUND**

¶3     The following facts are not disputed.

¶4     At all pertinent times, Diamond was an independent insurance agent, operating as Mark Diamond & Associates. Diamond held a Wisconsin nonresident insurance intermediary license from September 2014 until it was revoked in November 2018.

¶5     In October 2015, Diamond placed an advertisement for "educational workshops" in local Wisconsin newspapers. The advertisement promoted a "SENIOR RETIREMENT WORKSHOP" presented by "Senior Education Counsel." Senior Education Counsel is the name of a non-profit corporation operated by Diamond. A separate for-profit corporation, Retirement Planning Services, Inc., owned and operated by Diamond's wife, paid the expenses of

---

[4] The Commissioner also determined that Diamond did not timely report administrative actions taken against him by regulatory agencies in three other states, in violation of WIS. ADMIN. CODE § Ins 6.61(16)(a). However, Diamond makes no argument that the Commissioner erred with respect to the failure to timely report violations. Further, Diamond does not advance any argument challenging the revocation of his license. Diamond concludes by asking that we reverse the revocation, but he makes no argument in his briefing about the revocation. Accordingly, we do not further address those aspects of the Commissioner's decision.

presenting the workshops. As promoted in the advertisement, the topics to be discussed included, but were not limited to, protecting assets from catastrophic illness and nursing homes, reducing taxes, getting "guaranteed returns" in an unstable market, passing more retirement savings to heirs, and avoiding probate. The advertisement stated "Nothing will be sold at this seminar."

¶6      Diamond held two of the advertised "educational workshops" in Neenah, Wisconsin. Diamond did not directly sell any products at the workshops but gave participants evaluation forms that asked whether the participants were interested in free consultations to learn more about the topics presented at the workshops. Diamond subsequently met with participants who requested free consultations; during the consultations he recommended and sold financial products, for which he received commissions. Diamond has no clients in Wisconsin to whom he sold insurance products aside from clients whom he met at one of his workshops.

¶7      Helen and Clarence Lotzer attended Diamond's workshop on October 26, 2015. They completed the offered evaluation form and indicated that they were interested in a free consultation. The Lotzers were in their seventies at the time and were particularly interested in protecting their assets from nursing homes because Clarence had begun to show signs of difficulty processing information and of significant memory loss.

¶8      On October 29, 2015, Diamond met with the Lotzers at their home for the consultation. At that time, the Lotzers owned three variable annuities with a company called Voya, the largest of which was issued to Clarence. Clarence's Voya annuity had a value of approximately $350,000 and provided a benefit of approximately $480,000 upon his death. Diamond recommended that the Lotzers

"transfer" funds from Voya variable annuities and use those funds to purchase fixed annuities with a company called Forethought.[5] Diamond advised the Lotzers that such a transfer made sense because the value of the Forethought annuities would be less susceptible to losses associated with the stock market.

¶9    Before his "consultation" with the Lotzers, Diamond had never sold a variable annuity. He had never worked with and was unfamiliar with annuities, like the Voya ones that the Lotzers held, that have enhanced death benefits.

¶10    To clarify the terms of the Voya death benefits, Diamond called Voya during his "consultation" with the Lotzers and spoke with a representative on speakerphone about Clarence's annuity. A recording of the call made by Voya reflects that Diamond was informed by a Voya representative that "the minimum required balance" to maintain the death benefit on that annuity was $2,500. The representative further informed Diamond that "any withdrawal done reduces the death benefit amount…proportionately, not dollar per dollar."

¶11    We pause to note that, as explained by the prospectus for the Voya annuities, the statement that a withdrawal reduces the death benefit amount "proportionately" means that the percentage reduction in the value of the annuity resulting from a withdrawal will result in an equal percentage reduction in the

---

[5] As defined in exhibits in the record, an annuity is a contract between an insured and an insurance company that is designed to meet retirement and other long-range goals, under which the insured makes one or more purchase payments to the insurer and the insurer agrees to make periodic payments to the insured in return. A fixed annuity sets specific terms by which the periodic payments to the insured are calculated. With a variable annuity, the rate of return and amount of periodic payments to the insured vary depending on the performance of the investment options chosen by the insured.

death benefit. Diamond did not read the Voya prospectus before recommending or effectuating the transaction he proposed.

¶12 Resuming the facts, after this first telephone conversation with the Voya representative, the Lotzers and Diamond completed application paperwork directing the transfer of substantial portions of the funds from the three Voya annuities to the purchase of three Forethought annuities. Diamond certified on the application that the transactions were suitable for the Lotzers, writing "by only taking a partial withdraw[al] from the current [Voya annuities] we can almost double their death benefit."

¶13 Sometime after the consultation ended, Helen contacted Diamond to express concern about whether the entire Voya death benefits would be preserved if the Lotzers transferred funds from the Voya annuities and used them to purchase the Forethought fixed annuities. In response to Helen's concerns about maintaining the Voya death benefits, Diamond returned to the Lotzers' home on November 3, 2015, and placed a second call to Voya. No recording of the second call was introduced as evidence at the OCI hearing. While the participants presented different accounts of what transpired during the second call, at the call's conclusion Helen understood that transferring money from the Voya annuities to the Forethought annuities would not affect the death benefits. The Lotzers moved forward with the previously completed application paperwork for the transfers to the Forethought annuities.

¶14 The Lotzers transferred $300,000 from Clarence's Voya annuity and smaller sums of money from the other two Voya annuities held by the Lotzers to purchase Forethought annuities. In January 2016, Helen received a Voya statement that indicated that the death benefit for Clarence's Voya annuity was

reduced from $479,759.40 to $65,653.23 and that the death benefits for the remaining two Voya annuities were similarly reduced, one from $30,152.84 to $3,294.26 and the other from $19,849.95 to $3,793.58.

¶15 Helen contacted Diamond, who drafted, on the Lotzers' behalf and for their signature, a letter to Voya and OCI asserting that Voya had incorrectly represented that the full death benefits would remain intact even if the Lotzers transferred some of the cash balances to different annuities. Diamond also made a third call to Voya. The Voya representative indicated that Diamond must have misunderstood or misheard information provided in previous phone calls to Voya or that he must have been provided with incorrect information during the earlier calls.

¶16 OCI subsequently issued a notice of hearing alleging that Diamond violated Wisconsin statutes and regulations governing insurance intermediaries. An evidentiary hearing took place before an administrative law judge (ALJ) with the Division of Hearings and Appeals in June 2018. Pertinent to this appeal, the witnesses who testified at the hearing included Helen Lotzer, Diamond, and another insurance agent who was working with Diamond at pertinent times. The ALJ issued a proposed decision that included findings of fact and conclusions of law. Pertinent here, the ALJ determined that: (1) Diamond misled Wisconsin consumers "by implication and omission in violation of WIS. STAT. § 628.34(1)(a) and WIS. ADMIN. CODE § Ins 2.16(5)(a) by advertising a free retirement workshop with the true purposes of inducing potential insurance customers;" and (2) Diamond "did not have reasonable grounds to believe it was suitable for the Lotzers to withdraw funds from their Voya [annuities] to purchase Forethought [annuities]" in violation of WIS. STAT. §§ 628.347(2)(a) and (2)(a)(4)a.

7

¶17    In November 2018, the Commissioner issued a final decision that adopted the ALJ's proposed decision. As pertinent to the issues raised on appeal, the Commissioner's decision ordered Diamond to pay a forfeiture in the amount of $144,746.56 and to pay restitution to the Lotzers in the amount of $130,021.12.

¶18    Diamond petitioned for judicial review. In November 2019, the circuit court issued a comprehensive decision that affirmed the Commissioner's decisions, except that the court reduced the forfeiture to $47,130. Diamond appeals.

¶19    We present pertinent details of the Commissioner's decision, the testimony and evidence presented at the hearing, and the circuit court's decision in the discussion that follows.

## DISCUSSION

¶20    Diamond frames his appeal based on asserted errors by the circuit court. However, "[i]n an appeal of a circuit court order affirming or reversing an agency decision, we review the decision of the agency, not that of the circuit court." *Wisconsin Dep't of Revenue v. Microsoft Corp.*, 2019 WI App 62, ¶13, 389 Wis. 2d 350, 936 N.W.2d 160. Accordingly, we reframe Diamond's arguments based on their substance, as follows: (1) the Commissioner's determination that the advertisement misled consumers is not supported by the evidence and is based on a misinterpretation of WIS. STAT. § 628.34(1)(a); (2) the Commissioner's determination that Diamond had no reasonable grounds to believe that the transfer of funds from the Voya annuities to the Forethought annuities was suitable is not supported by the evidence; (3) the Commissioner improperly imposed the forfeiture even as reduced by the circuit court; and (4) the Commissioner erred in calculating restitution. We first summarize the standard

governing our review of the Commissioner's decision and then address and reject in turn each of Diamond's arguments.

## I. STANDARD OF REVIEW

¶21   "When reviewing findings of fact made by the [Commissioner], we will affirm the findings if those are supported by substantial evidence." *Id.*

> Substantial evidence does not mean a preponderance of evidence. It means whether, after considering all the evidence of record, reasonable minds could arrive at the conclusion reached by the trier of fact. "[T]he weight and credibility of the evidence are for the agency, not the reviewing court, to determine." An agency's findings of fact may be set aside only when a reasonable trier of fact could not have reached them from all the evidence before it, including the available inferences from that evidence.

*Milwaukee Symphony Orchestra, Inc. v. DOR*, 2010 WI 33, ¶31, 324 Wis. 2d 68, 781 N.W.2d 674 (footnotes and quoted source omitted).

¶22   "When reviewing questions of law decided by an agency, including statutory interpretation, our review is de novo." *Microsoft Corp.*, 389 Wis. 2d 350, ¶13. This court gives due weight to "the experience, technical competence, and specialized knowledge of the agency involved, as well as the discretionary authority conferred upon it." WIS. STAT. § 227.57(10); *Tetra Tech EC, Inc. v. DOR*, 2018 WI 75, ¶¶71, 75-76, 382 Wis. 2d 496, 914 N.W.2d 21. "Statutory interpretation begins with the statute's text. We give the text its common, ordinary and accepted meaning …. If the meaning of the statute is clear from its plain language, we do not look beyond that language to ascertain its meaning." *Microsoft Corp.*, 389 Wis. 2d 350, ¶14 (citations omitted). We apply the same principles in interpreting regulations. *Orion Flight Servs., Inc. v. Basler Flight Serv.*, 2006 WI 51, ¶18, 290 Wis. 2d 421, 714 N.W.2d 130 (interpretation of

administrative code provisions is a question of law that an appellate court reviews de novo using principles of statutory interpretation).

## II.  MISLEADING ADVERTISEMENT

¶23    The Commissioner determined that Diamond's workshop advertisement violated WIS. STAT. § 628.34(1)(a) and WIS. ADMIN. CODE § Ins 2.16(5)(a).  The statute provides in pertinent part that no licensed insurance intermediary "may make or cause to be made any communication relating to an insurance contract, the insurance business, any insurer, or any intermediary that contains false or misleading information, including information that is misleading because of incompleteness."  Sec. 628.34(1)(a).  The regulation provides that "[a]dvertisements, representations, and solicitations shall be truthful and not misleading in fact or in implication and shall accurately describe the policy, the insurance business, any insurer, or any intermediary to which they apply."  WIS. ADMIN. CODE § Ins 2.16(5)(a).

¶24    The Commissioner based the specific determination that Diamond used "misleading advertising to attract Wisconsin insurance consumers" on the following undisputed facts.  First, the advertisement identified Diamond, the presenter of the workshop, as "Senior Education Counsel," which was the name of his non-profit organization, and failed to identify Diamond as an insurance agent or make any mention of insurance products.  Second, the advertisement stated that nothing would be sold at the workshop, which was "technically" true but failed to disclose that Diamond planned to use the workshop as a means to solicit consultations with potential clients to whom he hoped to sell insurance products that had been discussed at the workshop.  Thus, the Commissioner determined, the advertisement was misleading by omission and in implication

10

¶25 The facts underlying the Commissioner's determination are supported by substantial evidence in the record, and Diamond does not argue to the contrary. Rather, Diamond contends that the advertisement was not misleading for the following reasons. First, he points to one dictionary definition of "mislead" as to "deceive," and from this derives an argument that "OCI introduced no evidence that any attendee of any workshop was deceived" or that any attendee "received any unwanted sales contact." Second, he argues that nothing in WIS. STAT. § 628.34(1)(a) and WIS. ADMIN. CODE § Ins 2.16(5)(a) requires that an advertisement of this type state that Diamond is a licensed insurance agent. Third, he argues that the advertisement did not "describe a policy, the insurance business, or any insurer," and therefore could not have done so in an untruthful or misleading way.

¶26 As to Diamond's first argument, evidence bearing on what attendees in fact believed or whether any attendee received an "unwanted sales contact" was not relevant to determining whether the advertisement was objectively misleading by omission and implication.

¶27 As to Diamond's second argument, the failure of the advertisement to identify Diamond as a licensed insurance agent is "communication relating to … [an] intermediary" that is "misleading because of incompleteness" and "by implication," WIS. STAT. § 628.34(1)(a) and WIS. ADMIN. CODE § Ins 2.16(5)(a), in at least two respects. First, the advertisement identified Diamond, the presenter, only as Senior Education Counsel, not as an insurance agent. Second, there was a combination of other misleading elements. Diamond admitted at the hearing before the ALJ that his discussion of Medicaid planning at the workshops required him to discuss insurance annuity products, even though the advertisement did not mention such products. Thus, the statement that no sales would be made *at the*

11

*workshop* and the absence of any reference to the insurance products that Diamond would describe at the workshop together constituted omissions that failed to apprise attendees that Diamond planned to use the workshop to set up insurance sales *after the workshop*.

¶28   Diamond's third argument—that the advertisement failed to describe a "policy, the insurance business, or any insurer"—goes nowhere because it is beside the point.  The point is that the advertisement failed to describe "an intermediary," WIS. STAT. § 628.34(1)(a), namely, Diamond.

¶29   In sum, Diamond fails to show that the Commissioner misapplied the law or that substantial evidence does not support the Commissioner's determination that the advertisement violated WIS. STAT. § 628.34(1)(a) and WIS. ADMIN. CODE § Ins 2.16(5)(a).

## III.  UNSUITABLE TRANSACTION

¶30   The Commissioner determined that Diamond did not have reasonable grounds as required by WIS. STAT. § 628.347(2)(a) to believe that it was suitable for the Lotzers to transfer funds from their existing annuities to purchase the annuities Diamond was selling.  That statute provides:

> (a)  In recommending to a consumer the purchase of an annuity, or the exchange of an annuity that results in an insurance transaction or series of insurance transactions, an insurance intermediary … shall have reasonable grounds to believe that the recommendation is suitable for the consumer on the basis of facts disclosed by the consumer as to his or her investments, other insurance products, and financial situation and needs, including the consumer's suitability information, and that all of the following are true:
>
> ….

3. The … transaction as a whole is suitable, for the particular consumer based on his or her suitability information.

4. In the case of an exchange or replacement of annuity, the exchange or replacement is suitable, including taking into consideration all of the following:

a. Whether the consumer will … lose existing benefits, such as death, living, or other contractual benefits….

Sec. 628.347(2)(a)

¶31    We first provide additional pertinent record evidence and summarize pertinent aspects of the Commissioner's determination, and then address Diamond's arguments challenging that determination.

¶32    As stated above, in the first phone call with Voya, in which the Lotzers participated, the Voya representative said that any withdrawal would reduce the death benefit amount proportionately. The following exchange then took place:

> [DIAMOND]: I understand. I understand. But $2,500 would maintain the death benefit currently. Is that correct?
>
> [VOYA]: Yes.
>
> [DIAMOND]: Okay. Um, any other questions?
>
> [CLARENCE]: No.
>
> [HELEN]: I, I don't quite understand that. If, if the $350,000 is gone –
>
> [DIAMOND]: No, no, no. No, you, you have to maintain a certain amount of money in the account to [inaudible] that [inaudible] and that amount is $2,500 in order to maintain the –
>
> [CLARENCE]: [inaudible]

[DIAMOND]: Now if, if you have the living benefit, which you haven't activated, any withdrawal would reduce that living benefit. But you haven't activated that yet, so, no, no, I, I know exactly what the product is; I just want to make sure that you know what it is. Okay?

¶33 Helen testified that, after the first call, "it seemed like … we could have both …. Taking money out and still having the death benefit there." She testified that she became nervous the more she thought about it and that she called Diamond to express her concern about losing the death benefit. She testified that she did not speak during the unrecorded, second call that Diamond made to Voya, that only Diamond spoke to Voya, and that "apparently, it must have sounded okay to me because we … moved forward."

¶34 Diamond testified that the Voya representative clarified during the second call that leaving $2,500 in the Voya annuity would maintain "the death benefit of that $477,000." He testified that Helen "took control of the conversation" and asked "'Now, let me get this straight, if we just leave $2,500 in the account, would that make—and my husband dies the next day—will I be paid 470-some thousand dollars?'" to which the Voya representative answered, "'Yes.'" The insurance agent who was working with Diamond at the time and was present for the second call similarly testified that Helen asked this question and received this answer during the call.

¶35 Diamond testified that he had never sold variable annuities before his interactions with Lotzers and was unfamiliar with annuities that, like the Voya annuities, had enhanced death benefits. Diamond testified that the transaction was intended to give the Lotzers $842,561.00 in total death benefits but that the transaction "fell short" and "did not work as intended." He also testified that, other than the death benefit issue, there is no indication that the product he sold

them was unsuitable. The insurance agent who was working with Diamond at the time testified that he and Diamond did not review the Voya prospectus to confirm that the $2,500 balance would pay a death benefit of more than $400,000.

¶36 The Commissioner relied on the following undisputed facts to determine that Diamond lacked reasonable grounds to believe that his recommendation to transfer funds from the Voya annuities to purchase the Forethought annuities was suitable for the Lotzers. As the Commissioner put it, these facts showed that the transaction was "too good to be true." First, Diamond admitted that he was unfamiliar with variable annuities and those that, like the Voya annuities, provided enhanced death benefits; therefore, Diamond "could not possibly" have determined whether the Forethought annuities were suitable "because he did not understand whether the Lotzers would lose existing benefits." Second, in the first phone call with Voya, Diamond focused on the statement that the minimum required balance on Clarence's annuity was $2,500 but ignored the follow-up statement that any withdrawals would reduce the death benefit amount proportionately. When Helen sought clarification, Diamond "shut her down and assured her—incorrectly—that he knew 'exactly' what the Voya product was." Third, immediately after the first call, Diamond signed Clarence's application for the Forethought annuity and certified that it was a suitable product because "by only taking a partial withdrawal from the current policy we can almost double their death benefit"; in explaining the transaction to Forethought, Diamond asserted that the death benefits would increase from $515,561 to $842,561, when in fact the death benefits from the existing Voya annuities decreased from $529,762.19 to $72,741.07.

¶37 As stated, Diamond does not dispute the Commissioner's finding that "the Lotzers lost the vast majority of the death benefits they had accumulated

15

with Voya." Diamond also does not dispute the Commissioner's finding that Diamond was unfamiliar with and did not understand annuities like the Voya annuities and, therefore, "could not possibly" have been able to assess the suitability of transferring money from them to a different kind of annuity. The Commissioner found that "[w]ithout understanding the policies [Diamond] was recommending his customers replace, he could not possibly have had reasonable grounds" to determine whether his recommendation was suitable. As the Commissioner notes, that Diamond incorrectly certified the transfer's suitability because it would "almost double [the Lotzers'] death benefit" confirms Diamond's inability to reasonably assess his proposal's suitability.

¶38    Diamond argues that the Commissioner's determination disregards certain other evidence: (1) that Diamond certified the transaction as suitable based on assurances from Voya that the transaction would not reduce the Lotzers' death benefits, and (2) that the transaction was suitable because it increased the Lotzers' wealth. We address each argument in turn.

¶39    First, Diamond argues that the Commissioner's determination of nonsuitability disregards evidence showing that Diamond relied on "serial misrepresentations" by Voya regarding the effect of the proposed transaction on the Voya death benefits and that he waited to make a final suitability determination until he received "absolute assurances" from Voya during the second phone call. However, substantial evidence supports the Commissioner's findings to the contrary.

¶40    The Commissioner found the following. The information provided by Voya during the first, recorded call was sufficiently clear to "put [Diamond] on notice" that any withdrawals would reduce the death benefits proportionately.

Diamond affirmatively deflected attempts at clarification and insisted that he knew "exactly" how the Voya annuity worked, even though he had not read the Voya prospectus. The substance of the second call, while disputed, was irrelevant because the call occurred after Diamond completed and signed the Forethought application paperwork and certified the suitability of the transaction.

¶41     Diamond argues that the transcript of the first call shows that the Voya representative misled him and argues that the fact that he made a second call shows that he had not yet made "a final suitability determination." Diamond merely offers a favorable inference from the evidence, which is unavailing because substantial evidence supports the unfavorable inferences reasonably accepted by the Commissioner. *See Ellis v. DOA*, 2011 WI App 67, ¶31 n.7, 333 Wis. 2d 228, 800 N.W.2d 6 ("where two conflicting views may each be sustained by substantial evidence … it is for the agency to determine which view of the evidence it wishes to accept") (citation and internal quotation marks omitted); *Hilton ex rel. Pages Homeowners' Ass'n v. Department of Nat. Res.*, 2006 WI 84, ¶25, 293 Wis. 2d 1, 717 N.W.2d 166 ("The agency's decision may be set aside by a reviewing court only when, upon an examination of the entire record, the evidence, including the inferences therefrom, is such that a reasonable person, acting reasonably, could not have reached the decision from the evidence and its inferences.") (citation and internal quotation marks omitted).

¶42     Second, Diamond asserts, without citing record evidence, that the Commissioner's unsuitability decision disregards evidence that the transaction was suitable for the Lotzers because the Forethought annuities were superior to the

17

Voya annuities and "made them … considerable money."[6] However, this assertion disregards the above-summarized evidence that Diamond, when he certified the transaction as suitable, did not know enough about the Voya annuities to reliably compare them to the Forethought annuities or to evaluate whether transferring significant sums of money from them was suitable for the Lotzers. Thus, Diamond's unsupported assertion is not a basis to disturb our conclusion that substantial evidence supports the Commissioner's determination that Diamond violated the law by recommending insurance transactions without reasonable grounds to believe they were suitable.

¶43 Finally, and separately from his challenge to the Commissioner's factual findings, Diamond appears to argue that to affirm the Commissioner's determination regarding the suitability violation would require "excessive" deference to the Commissioner. This assertion fails for the following reasons. First, as discussed above, our conclusion that the Commissioner's decision is supported by substantial evidence involves no deference to the Commissioner on any legal question. Second, Diamond does not explain in what way analysis of the suitability violation implicates any deference to the Commissioner on any legal question. We decline to consider it further. *See State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992) ("We may decline to review issues

---

[6] The Commissioner correctly notes that Diamond asserts as a fact that the Forethought annuities made the Lotzers money, but Diamond provides no citation to the record in support of that assertion. We generally do not consider arguments unsupported by references to the record. *See State v. McMorris*, 2007 WI App 231, ¶30, 306 Wis. 2d 79, 742 N.W.2d 322 (court of appeals may "choose not to consider … arguments that lack proper citations to the record."); *Jensen v. McPherson*, 2004 WI App 145, ¶6 n.4, 275 Wis. 2d 604, 685 N.W.2d 603 ("It is not this court's responsibility to sift and glean the record in extenso to find facts supporting [the party's] argument."). However, we briefly explain in the text why we reject this argument on its merits.

inadequately briefed."). Third, Diamond conceded in oral argument to the circuit court that deference is owed the Commissioner on technical matters of insurance, including suitability and the differences between fixed and variable annuities.

¶44 In sum, we conclude that substantial evidence in the record supports the Commissioner's determination that Diamond violated the law by recommending insurance transactions without reasonable grounds to believe they were suitable.

## IV. FORFEITURE

¶45 As we will explain in greater detail below, the circuit court reduced the forfeiture imposed by the Commissioner for the misleading advertisement violation. On appeal, Diamond challenges the Commissioner's calculation of the forfeiture, even as reduced by the court.

¶46 The Commissioner imposed the forfeiture pursuant to WIS. STAT. § 601.64(3)(a), which reads: "Restitutionary forfeiture. Whoever violates … any insurance statute or rule … shall forfeit to the state twice the amount of profit gained from the violation, in addition to any other forfeiture or penalty imposed." We first summarize the Commissioner's forfeiture determination and the circuit court's reduction of the amount imposed and then explain why Diamond's challenge to the reduced amount fails.

¶47 The Commissioner found that Diamond sold annuity contracts to six customers whom "he obtained through the workshops" that were promoted by the misleading advertisement. He earned a total of $72,373.27 in commissions from these sales. The Commissioner determined that the profit that Diamond gained from his misleading advertisement violation was that total amount of commissions

because those were commissions that Diamond earned from Wisconsin customers "he would not have had but for the unlawful advertisement." The Commissioner thus doubled that amount pursuant to WIS. STAT. § 601.64(3)(a) and imposed a forfeiture of $144,746.56.

¶48 The circuit court reduced the forfeiture because the statute requires a causal connection between the misleading advertisement violation and the profit used to calculate the forfeiture, *see* WIS. STAT. § 601.64(3)(a) ("Whoever violates … any insurance state or rule … shall forfeit to the state twice the amount of *any profit gained from the violation*.") (emphasis added). It determined that Helen's testimony established the causal connection between the misleading advertisement and her attendance at the seminar and her "dealing[s] with Diamond," but that there was no evidence in the record regarding why the Wisconsin customers other than the Lotzers attended the workshops or purchased annuities from Diamond. Accordingly, the circuit court determined that the profit Diamond gained from the misleading advertisement was limited to the commissions he earned from the Lotzer transactions, which were undisputed to be $23,565 and thus yielded a forfeiture of $47,130.[7]

¶49 Diamond challenges the Commissioner's imposition of the forfeiture, as reduced by the circuit court, on three grounds. First, Diamond quotes an irrelevant statutory provision, which does not mention profit but instead provides that "whoever violates an order issued under s. 601.41(4) … shall forfeit to the state not more than $1,000 for each violation." WIS. STAT. § 601.64(3)(b).

---

[7] We do not weigh in on the circuit court's decision to reduce the restitution award because OCI has not cross appealed this decision.

¶50    Second, Diamond argues that there is no causal connection between the advertisement and the Lotzer transaction, for two reasons. The first reason he offers is that it is undisputed that the Lotzers knew he was an insurance agent "at all relevant points throughout the purchase process." However, Diamond provides no record citations to support this argument, which is a sufficient basis to reject his argument. Further, he does not explain how what the Lotzers knew during "the purchase process" establishes what they knew when they decided to attend the seminar or when they asked for a "consultation" after the seminar, all before "the purchase process." Accordingly, we reject this argument as undeveloped. *See State v. McMorris*, 2007 WI App 231, ¶30, 306 Wis. 2d 79, 742 N.W.2d 322 ("we may choose not to consider … arguments that lack proper citations to the record"); *Pettit*, 171 Wis. 2d at 646. The second reason he offers is that, even if the Lotzers would not have attended the workshop had they known he was an insurance agent who planned to use the workshop to make insurance sales to attendees after the workshop, any causal connection "between the advertisement and the transaction is too attenuated to support" a forfeiture. Diamond does not explain his "too attenuated" concept or provide any evidentiary support for it, and we reject it on that basis. To the extent that Diamond means to reiterate his arguments for why the advertisement was not misleading, we have addressed and rejected those arguments above.

¶51    Third, Diamond argues that the Commissioner improperly calculated "profit" by failing to deduct the expenses of hosting the workshop from his commissions, citing a dictionary definition of "profit" as "excess of revenues over expenditures." However, Diamond points to no evidence in the record that he incurred any such expenses. He testified that his non-profit organization Senior Education Counsel presented the workshops, and that "it neither takes money in

nor pays money out." He testified that Retirement Planning Services, Inc., owned and operated by his wife, paid the costs of the seminars and paid Diamond a speaker fee, and that Forethought paid him the commissions that resulted from the sale of insurance products. He contends that as part of OCI's burden to prove profit it was OCI's burden to present evidence of and deduct the expenses he paid. This argument is specious; as OCI responds, only Diamond would know what those expenses were, and he failed to present evidence of expenses.

¶52    In sum, Diamond fails to show that the Commissioner improperly imposed a forfeiture in the amount to which the circuit court reduced it.

## V.  RESTITUTION

¶53    The Commissioner awarded restitution pursuant to WIS. STAT. § 601.41(4)(a), which authorizes the Commissioner to issue "orders as are necessary to secure compliance with the law." Diamond does not challenge the Commissioner's determination that restitution was warranted here "to secure compliance with the law." Rather, Diamond challenges only the Commissioner's calculation of the amount of restitution as unsupported by evidence. We first summarize the Commissioner's calculation and then explain why we conclude that Diamond fails to show that the calculation was not supported by substantial evidence.

¶54    The purpose of restitution is to return victims to the position they occupied before they were injured. *State v. Holmgren*, 229 Wis. 2d 358, 366, 599 N.W.2d 876 (Ct. App. 1999). Here, the Commissioner stated that OCI sought restitution in an amount that would restore the Lotzers "to the position they would have occupied but for the unsuitable transaction." The Commissioner reasoned that such an amount was "most fairly determined by reference to the date of the

ill-advised transactions." To that end, the Commissioner calculated that the Voya death benefits were reduced from $529,762.19 to $72,741.07, for a loss of $457,021.12 as of the date of the transaction. The Commissioner then subtracted from that loss the guaranteed cash values of the Forethought annuities that the Lotzers gained, $327,000, to arrive at a "net loss of $130,021.12" and ordered that Diamond pay that amount as restitution.

¶55 Diamond does not argue that any of the amounts referenced by the Commissioner are unsupported by evidence in the record. Rather, Diamond challenges the date that the Commissioner used to arrive at those amounts as unsupported by the evidence. Specifically, Diamond argues that it was "plainly erroneous" for the Commissioner to base the calculation of restitution on the Voya death benefits and on the value of the Forethought annuities as if Clarence had died on the day of the transactions, because by doing so the Commissioner (1) overstated the lost death benefits of the Voya annuities, and (2) understated the gained value of the Forethought annuities. As we explain, Diamond's argument fails in several respects.

¶56 In support of his first point, Diamond asserts that, because the Voya death benefits were contingent on Clarence's death, which had not yet happened, the Commissioner did not have a basis in the evidence to determine that the Lotzers lost money as of the date of the transaction. Implicit in this assertion is the proposition that contingent death benefits were declining in value and would have lower value on the future date of Clarence's death than on the date of the transactions. Whatever the theoretical merits of this proposition, Diamond does not explain how or to what extent the death benefits here would have decreased over time, or what alternative method the Commissioner should have used given this dynamic. Nor does he offer a different calculation of what it would take to

restore the Lotzers to the position they were in before the unlawfully recommended transactions. *See **Holmgren***, 229 Wis. 2d at 366 (purpose of restitution is to put victims in same position as before they were injured); ***Office of Law. Regul. v. Edgar***, 2003 WI 49, ¶11, 261 Wis. 2d 413, 661 N.W.2d 817 (awarding restitution specified by the Office of Lawyer Regulation in light of attorney's failure to offer and support alternative amounts). We conclude that Diamond fails to show that the Commissioner's calculation of the death benefits was not based on substantial evidence of the value of those benefits on the date of the transaction.

¶57 In support of his second argument, Diamond asserts that the Commissioner undervalued the Forethought annuities because those annuities would increase in value every year that Clarence remained alive, thereby reducing the Lotzers' loss. Implicit in this assertion is the proposition that the Forethought annuities would be more valuable at the future date of Clarence's death than on the date of the transactions. Again, however, even if the theoretical proposition could have merit, Diamond fails to present a fully developed argument attempting to explain why the Commissioner's approach here was improper until his reply brief. Further, even in the reply brief, the details he offers provide too little support and come too late. *See **A.O. Smith Corp. v. Allstate Ins. Cos.***, 222 Wis. 2d 475, 492, 588 N.W.2d 285 (Ct. App. 1998) (this court generally does not address arguments developed for the first time in a reply brief). And even then, he fails to offer a "correct" number based on the evidence in the record. As with his first argument, we conclude that he fails to show that the Commissioner's calculation of the value of the Forethought annuities is not supported by substantial evidence.

## CONCLUSION

¶58    For the reasons stated, we affirm.

*By the Court.*—Order affirmed.

Not recommended for publication in the official reports.