COURT OF APPEALS
DECISION
DATED AND FILED

March 18, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2023AP1147**

STATE OF WISCONSIN

Cir. Ct. No. **2021CV114**

IN COURT OF APPEALS
DISTRICT III

B&D DAIRY FARM, LLC,

    PETITIONER-APPELLANT,

  V.

WISCONSIN DEPARTMENT OF NATURAL RESOURCES,

    RESPONDENT-RESPONDENT.

        APPEAL from an order of the circuit court for Marinette County: JANE M. SEQUIN, Judge. *Affirmed*.

        Before Stark, P.J., Hruz and Gill, JJ.

        **Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

        ¶1    PER CURIAM. B&D Dairy Farm, LLC, appeals from an order, affirming an administrative law judge's (ALJ) decision upholding the Department

of Natural Resources' (DNR) imposition of conditions on B&D's Wisconsin Pollutant Discharge Elimination System (WPDES) permit. *See* WIS. STAT. § 283.31 (2023-24).[1] We affirm the order.

## BACKGROUND

¶2 B&D is a large "concentrated animal feeding operation" (CAFO) with over 9,000 cows.[2] As of August 2018, B&D annually produced 62,000,000 gallons of liquid manure, 14,000 tons of solid manure, 3,000,000 gallons of feed storage pad leachate and runoff wastewater, and 5,000,000 gallons of runoff wastewater and leachate from calf hutch and feed bunker areas.

¶3 In August 2017, the DNR conducted a sanitary survey of B&D's calf facility.[3] During the survey, the DNR discovered that one of B&D's wells ("drinking water well") had a "broken electrical conduit and a cracked well cap." B&D corrected this deficiency, and the DNR communicated to B&D that its actions sufficiently fixed the issue.

---

[1] All references to the Wisconsin Statutes are to the 2023-24 version unless otherwise noted.

[2] "Generally speaking, a CAFO is 'a specific type of large-scale industrial agricultural facility that raises animals, usually at high-density, for the [production] of meat, eggs, or milk.'" *Clean Wis., Inc. v. DNR*, 2021 WI 71, ¶18, 398 Wis. 2d 386, 961 N.W.2d 346 (alteration in original; citation omitted). A "large CAFO" "means an animal feeding operation that has 1,000 animal units or more at any time." WIS. ADMIN. CODE § NR 243.03(31) (Nov. 2024). It is undisputed that B&D had nearly 10,000 animal units during the period relevant to this case.

All references to the DNR's administrative regulations are to the November 2024 register.

[3] The DNR determined that B&D's calf facility qualified as a "non-transient/non-community" water supply system because it supplied drinking water to twenty-five of B&D's employees under drinking water regulations. *See* WIS. ADMIN. CODE ch. NR 809.

2

¶4      In November 2017, the DNR collected a water sample, as part of regular drinking water monitoring requirements, from the drinking water well that B&D had corrected.  The DNR tested the water sample and found that the drinking water well had nitrate levels of 21.2 mg/L; over twice the permitted level of 10 mg/L.  In December 2017, a second test was conducted on a new sample taken from the drinking water well, which showed nitrate levels of 18.9 mg/L.  At least two additional drinking wells on B&D's property were tested around the same time, each showing nitrate levels below 0.25 mg/L.  The DNR issued a notice of violation to B&D for exceeding the standards for the nitrate levels in drinking water, and B&D promptly disconnected the offending drinking water well and replaced the water supply by connecting the calf facility to a different well.  The new well had "nitrate levels below the maximum containment level," and the DNR found that B&D's remedial actions were sufficient for purposes of the DNR's drinking water regulations.

¶5      Separately, B&D reapplied for a WPDES permit renewal under WIS. STAT. § 283.31.  B&D has been operating under WPDES permits for over twenty years.[4]  During B&D's WPDES permit renewal application process, the DNR determined that the high nitrate levels detected in the drinking water well during the drinking water monitoring necessitated groundwater monitoring.  Thus, the DNR issued B&D a WPDES permit with several conditions related to groundwater monitoring.

---

[4] B&D asks this court to take judicial notice of its WPDES permit renewal from August 2023.  We fail to see how that permit renewal, which began after the ALJ's disposition in this case, is relevant.  In addition, although the DNR found no violations during its inspection related to the 2023 permit, the DNR noted that a review of the groundwater monitoring conditions imposed in this case was pending.  Moreover, it does not appear that any of the wells on B&D's property were tested as part of the 2023 permit renewal process.

¶6      According to a DNR memorandum from August 2018, William Phelps, the leading hydrogeologist reviewing B&D's permit application on behalf of the DNR, recommended the groundwater monitoring permit conditions, stating that an inspection of B&D's property "identified a number of potential sources of nitrogen contamination" that were leading to nitrogen levels exceeding those allowed by law.  These potential sources included "wastewater runoff from … two calf hutch areas, wastewater runoff from a 'dry cow' earthen lot, wastewater runoff from cattle feeds lots …, feed storage area wastewater runoff, three animal waste and process wastewater storage structures[,] and wastewater runoff from solid manure stacking areas."  Phelps also based his recommendation on the fact that B&D's property is "underlain with sandy soils that [are] susceptible to groundwater contamination."

¶7      B&D filed a petition for a contested hearing, challenging several of the groundwater monitoring conditions contained in the permit—specifically those requiring "planning, installation, monitoring[,] and reporting of a groundwater monitoring system."  B&D argued, in pertinent part, that the conditions were unlawful and were not supported by "substantial evidence in the agency record demonstrating the reasonableness or necessity for requiring" the conditions.

¶8      Following a three-day hearing, an ALJ upheld the permit conditions after concluding that the DNR properly found that groundwater monitoring conditions were necessary and warranted under WIS. ADMIN. CODE § NR 243.15(7).  The DNR adopted the ALJ's final decision as its own.  *See* WIS. STAT. § 227.46(3)(a); WIS. ADMIN. CODE § NR 2.155(1).  B&D then challenged the ALJ's decision in the circuit court.  The court also upheld the groundwater monitoring conditions.  This appeal follows.

## DISCUSSION

¶9 "When an appeal is taken from a circuit court order reviewing an agency decision, we review the decision of the agency, not the circuit court." ***Hilton ex rel. Pages Homeowners' Ass'n v. DNR***, 2006 WI 84, ¶15, 293 Wis. 2d 1, 717 N.W.2d 166. Here, as explained above, the DNR adopted the ALJ's decision as its own. *See* WIS. STAT. § 227.46(3)(a); WIS. ADMIN. CODE § NR 2.155(1). "Accordingly, we review the ALJ's decision as the [DNR's] final decision." *See* ***Meteor Timber, LLC v. DHA***, 2022 WI App 5, ¶20, 400 Wis. 2d 451, 969 N.W.2d 746 (2021).

¶10 Unless a reviewing "court finds a ground for setting aside, modifying, remanding or ordering agency action or ancillary relief under a specified provision of [WIS. STAT. § 227.57], it shall affirm the agency's action." Sec. 227.57(2). A reviewing court shall "set aside [an] agency action or remand the case to the agency if it finds that the agency's action depends on any finding of fact that is not supported by substantial evidence in the record." Sec. 227.57(6). "An agency's findings are supported by substantial evidence if a reasonable person could arrive at the same conclusion as the agency." ***Clean Wis., Inc. v. PSC***, 2005 WI 93, ¶46, 282 Wis. 2d 250, 700 N.W.2d 768. Likewise, a court

> shall reverse or remand the case to the agency if it finds that the agency's exercise of discretion is outside the range of discretion delegated to the agency by law; is inconsistent with an agency rule, an officially stated agency policy or a prior agency practice, if deviation therefrom is not explained to the satisfaction of the court by the agency; or is otherwise in violation of a constitutional or statutory provision; but the court shall not substitute its judgment for that of the agency on an issue of discretion.

Sec. 227.57(8).

¶11    A reviewing "court shall set aside or modify the agency action if it finds that the agency has erroneously interpreted a provision of law and a correct interpretation compels a particular action," or, alternatively, the court "shall remand the case to the agency for further action under a correct interpretation of the provision of law."  WIS. STAT. § 227.57(5).  When reviewing an agency's conclusions of law, our review is de novo.  *Tetra Tech EC, Inc. v. DOR*, 2018 WI 75, ¶84, 382 Wis. 2d 496, 914 N.W.2d 21; § 227.57(11).  "[D]ue weight shall be accorded" to "the experience, technical competence, and specialized knowledge of the agency involved, as well as discretionary authority conferred upon it." Sec. 227.57(10).  "'Due weight' is a matter of persuasion, not deference." *Tetra Tech*, 382 Wis. 2d 496, ¶78.

## I.  Deference to the DNR

¶12    B&D first asserts that the ALJ, contrary to *Tetra Tech*, "deferred" to the DNR's decision to issue the WPDES permit conditions "without an analysis of the many factual shortcomings of [the] []DNR's case" and "without any construal of the relevant statutes against the facts."  In doing so, B&D argues that the ALJ failed to determine whether:  (1) the nitrate data obtained from the drinking water well could "lawfully be used to determine compliance or noncompliance" with the groundwater standards set forth in WIS. STAT. ch. 160 and WIS. ADMIN. CODE ch. NR 140; and (2) the DNR exceeded the authority granted to it under WIS. ADMIN CODE § NR 243.15(7).

¶13    We first note that even if the ALJ deferred to the DNR in some fashion, B&D has failed to cite a particular basis under WIS. STAT. § 227.57 upon which this court could find a "ground for setting aside, modifying, remanding or ordering agency action." *See* § 227.57(2).  As the DNR observes, "unless B&D

shows that what it calls improper 'deference' ran afoul of any of the standards in … § 227.57, whether the ALJ 'deferred' to anyone or anything is not itself an independent issue for this [c]ourt to review." That is, even if the ALJ did not specifically interpret and apply WIS. STAT. ch. 160, WIS. ADMIN. CODE ch. NR 140, and WIS. ADMIN CODE § NR 243.15(7) to the facts of this case, we will still affirm the ALJ's ruling unless there is a basis within § 227.57 not to do so. In its reply brief, B&D did not respond to the DNR's argument in this regard, either generally or with a specific reversal standard under § 227.57, and we could therefore deem that B&D has conceded this issue. *See **United Coop. v. Frontier FS Coop.***, 2007 WI App 197, ¶39, 304 Wis. 2d 750, 738 N.W.2d 578.

¶14 Regardless, we disagree with B&D that the ALJ "deferred" to the DNR. Citing ***Tetra Tech***, the ALJ "identified four factors to evaluate the persuasiveness of an agency's perspective in order to determine whether to afford [the agency] due weight." This analysis is precisely what ***Tetra Tech*** dictates. *See **Tetra Tech***, 382 Wis. 2d 496, ¶79 ("As we assess the persuasiveness of the agency's perspective, we will consider the same types of factors that formerly informed our deference doctrine …."). Nothing in the ALJ's decision, including her legal analysis, demonstrates that she gave deference, rather than due weight, to the DNR's decision to issue the permit conditions in this case. *See **id.***, ¶78.

¶15 The ALJ issued her decision after outlining the controlling law cited by the DNR in support of the conditions and making findings of fact based on the evidence presented by both B&D and the DNR. While the ALJ cited the DNR's "expertise and specialized knowledge" in this field, the ALJ also provided an independent assessment of the evidence and explained why the DNR's decision to impose groundwater monitoring conditions was reasonable and permitted under the law. In particular, the ALJ found the DNR's witnesses more credible than

B&D's witnesses in several respects and, accordingly, determined that the nitrate levels detected on B&D's property were "significant," that the significant nitrate levels would "not occur without a source of contamination," and that the soils underlying B&D's property would not protect the groundwater from nitrate contamination. The ALJ also found that the nitrate levels on B&D's property were "well outside both preventive action and exceedance levels" and that the levels demonstrated "an indication that the groundwater has been contaminated." Thus, the ALJ found, after interdependently reviewing the evidence presented, that the permit conditions were necessary to evaluate impacts to groundwater and geologic or construction conditions pursuant to Wis. Admin Code § NR 243.15(7).

## II. The DNR's authority

¶16　Next, B&D argues that the DNR exceeded its authority by imposing the groundwater monitoring conditions in B&D's WPDES permit. The WPDES permit program "is outlined in [Wis. Stat.] ch. 283 …, wherein the DNR is granted 'all authority necessary to establish, administer and maintain a state pollutant discharge elimination system' in order to protect the 'waters of this state,' … from pollution." *Clean Wis., Inc. v. DNR*, 2021 WI 71, ¶17, 398 Wis. 2d 386, 961 N.W.2d 346 (quoting Wis. Stat. § 283.001(2)). Under ch. 283, "[t]he discharge of any pollutant into any waters of the state … is unlawful unless such discharge or disposal is done under a permit issued by the" DNR. Wis. Stat. § 283.31(1). The term "[w]aters of this state" is defined to include groundwater. Wis. Stat. § 283.01(20). "CAFOs are statutorily required to apply to the DNR for a WPDES permit because they are 'point sources' as defined in" § 283.01(12). *Clean Wis.*, 398 Wis. 2d 386, ¶18.

¶17   The DNR "may issue a permit … for the discharge of any pollutant, or combination of pollutants …, upon condition that such discharges will meet" several requirements outlined by statute.   WIS. STAT. § 283.31(3).   One requirement for a WPDES permit is that the discharge will meet "[g]roundwater protection standards established under [WIS. STAT.] ch. 160."   Sec. 283.31(3)(f). "The Legislature gave the DNR broad authority to establish, monitor, and enforce health-based groundwater standards in … ch. 160, which resulted in the promulgation of" WIS. ADMIN. CODE ch. NR 140.  *Clean Wis.*, 398 Wis. 2d 386, ¶30.  Chapter NR 140 establishes Wisconsin's groundwater quality standards and "applies to all facilities regulated by WIS. STAT. ch. 283," including CAFOs. *See Clean Wis.*, 398 Wis. 2d 386, ¶30.   As relevant here, the groundwater "enforcement standard" for nitrate levels is 10 mg/L.   WIS. STAT. § 160.25(2); WIS. ADMIN. CODE § NR 140.10 (Table 1).

¶18   "[I]f the concentration of a substance in groundwater attains or exceeds an enforcement standard" at a CAFO, the DNR "shall require remedial actions for a specific site in accordance with rules promulgated under [WIS. STAT. §] 160.21 as are necessary to achieve compliance with the enforcement standard at the point of standards application."   *See* WIS. STAT. § 160.25(2).   Any required response must be tailored "to prevent any new releases of the substance from traveling beyond" defined limits and must "restore contaminated groundwater within a reasonable period of time."   WIS. ADMIN. CODE § NR 140.26(2)(a).   The DNR may, for example, require "the installation and sampling of groundwater monitoring wells."   *See* WIS. ADMIN. CODE § NR 140.24(4) (Table 5) (incorporated by reference under § NR 140.26(2)(a)).

¶19   The DNR further regulates groundwater quality with respect to CAFOs under WIS. ADMIN. CODE ch. NR 243, which "requires CAFOs to comply

9

with groundwater quality standards" contained in WIS. ADMIN. CODE ch. NR 140. *See Clean Wis.*, 398 Wis. 2d 386, ¶¶30, 39. For large CAFOs, the DNR "shall include conditions in a WPDES permit for the production area and ancillary service and storage areas … that are necessary to achieve compliance with … groundwater quality standards contained in" the DNR regulations, including ch. NR 140. WIS. ADMIN. CODE § NR 243.13(1). In addition, ch. NR 243 permits the DNR to "require the installation of groundwater monitoring wells in the vicinity of manure storage facilities, runoff control systems, permanent spray irrigation systems and other treatment systems where the [DNR] determines monitoring is necessary to evaluate impacts to groundwater and geologic or construction conditions warrant monitoring."[5] WIS. ADMIN. CODE § NR 243.15(7).

¶20 To ensure compliance with WIS. STAT. § 283.31(3) (and thus the "[g]roundwater protection standards" identified in WIS. STAT. ch. 160 and WIS. ADMIN. CODE chs. NR 140 and 243), the DNR "shall prescribe conditions for permits." Sec. 283.31(4). Therefore, it is clear that the DNR has the authority— indeed, is required under § 283.31(3)(f)—to issue groundwater monitoring conditions as part of a WPDES permit if those conditions are necessary to ensure compliance with groundwater protection standards. B&D does not seriously dispute this conclusion. In fact, our state supreme court recently reached a similar

---

[5] Although this provision applies to "proposed facilities or systems," the DNR "may require additional … conditions" for a WPDES permit, including "installation of … groundwater monitoring," based upon its "review of submitted evaluations of previously constructed structures or systems" at a CAFO. WIS. ADMIN. CODE § NR 243.16(3); *see also* § NR 243.16(2). The DNR correctly notes that "[w]hile B&D disputes whether the factual predicates for monitoring under WIS. ADMIN. CODE § NR 243.15(7) were satisfied, [B&D] does not dispute that" § NR 243.15(7) could apply to the permit conditions in this case. B&D did not respond to this assertion.

conclusion, holding that the DNR has explicit authority to impose off-site groundwater monitoring conditions as part of a WPDES permit for a CAFO. *See Clean Wis.*, 398 Wis. 2d 386, ¶¶27-29, 30-32, 37-40.

¶21 Focusing on WIS. ADMIN. CODE § NR 243.15(7), B&D first argues that "there is no evidence in the record *from a groundwater monitoring well* that indicates an exceedance of groundwater protection standards caused by [B&D's] operations."[6] (Emphasis added.) B&D asserts that WIS. ADMIN. CODE § NR 140.16(1)(b) requires that "[a]ll groundwater samples collected to determine compliance with" groundwater standards "must be collected from a groundwater monitoring well that meets" DNR "standards." According to B&D, compliance with WIS. ADMIN. CODE ch. NR 140 "can only be determined from a well that meets the standards for groundwater monitoring contained in WIS. ADMIN. CODE ch. NR 141."

¶22 We agree with the DNR that WIS. ADMIN CODE § NR 243.15(7) does not require the pertinent enforcement standard reading to be taken from an existing "groundwater monitoring well" in order for the DNR to "require the installation of groundwater monitoring wells." *See id.* Nor does any other relevant statute or regulation include such a requirement, including WIS. ADMIN. CODE § NR 140.16(1)(a)-(c) (outlining groundwater quality sample collection procedure for purposes of compliance with WIS. STAT. ch. 160). Chapter NR 140 makes no reference to WIS. ADMIN. CODE ch. NR 141, and the purpose of the

---

[6] The ALJ determined that the DNR could impose the groundwater monitoring conditions pursuant to WIS. ADMIN. CODE § NR 243.15(7). The ALJ did not address the scope of the DNR's authority under WIS. STAT. § 160.25(2) and WIS. ADMIN. CODE § NR 140.24(4) (Table 5). Accordingly, and because we agree with the ALJ's analysis of § NR 243.15(7) as applied to the facts of this case, we will focus our analysis on § NR 243.15(7).

latter "is to establish minimum acceptable standards for the design, installation, construction, abandonment and documentation of groundwater monitoring wells." WIS. ADMIN. CODE § NR 141.01. Thus, ch. NR 141 is relevant to this case only to the extent that it provides the standards applicable to B&D's construction of its groundwater monitoring wells. *See* WIS. ADMIN. CODE § NR 243.15(7) (stating that "[i]f a groundwater monitoring system is required, … the system shall, at a minimum, be designed, constructed and monitored in accordance with" WIS. ADMIN. CODE chs. NR 140, 141, and WIS. ADMIN. CODE § NR 214.21).

¶23 A conclusion that WIS. ADMIN CODE § NR 243.15(7) requires an existing "groundwater monitoring well" in order for the DNR to "require the installation of groundwater monitoring wells" would add words to the regulations that do not exist. *See State v. Fitzgerald*, 2019 WI 69, ¶30, 387 Wis. 2d 384, 929 N.W.2d 165 ("One of the maxims of statutory construction is that courts should not add words to a statute to give it a certain meaning." (citation omitted)); *Piper v. Jones Dairy Farm*, 2020 WI 28, ¶13, 390 Wis. 2d 762, 940 N.W.2d 701 ("We interpret an administrative regulation using the rules of statutory interpretation."). Further, such a conclusion would be counterintuitive and circuitous by dictating that the DNR first require a CAFO to have a groundwater monitoring well before the DNR could require the CAFO to have a groundwater monitoring well. All that is required under this particular regulation is that the DNR determine that "monitoring is necessary to evaluate impacts to groundwater and geologic or construction conditions warrant monitoring." *See* § NR 243.15(7).

¶24 Similar to its previous argument, B&D also asserts that the DNR improperly detected the nitrate levels through the drinking water well and that a drinking water well cannot form the basis for imposing groundwater monitoring as a condition for a WPDES permit. B&D fails to adequately explain why the DNR

cannot use "drinking water data as a basis to impose groundwater monitoring." *See **State v. Pettit***, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992) (stating that we need not consider undeveloped arguments).

¶25 Furthermore, and as outlined and discussed above, the DNR has the authority under WIS. STAT. § 283.31, WIS. STAT. ch. 160, and WIS. ADMIN. CODE chs. NR 140 and 243 to issue groundwater monitoring conditions as part of a WPDES permit as long as those conditions are necessary to ensure compliance with groundwater protection standards. Nothing in these statutes or regulations prohibit the DNR from obtaining a groundwater reading regarding nitrates levels from drinking water data.

¶26 In addition, B&D contends that the DNR failed to demonstrate that the groundwater monitoring conditions were "*necessary* to evaluate impacts to groundwater." *See* WIS. ADMIN. CODE § NR 243.15(7) (emphasis added). We agree with the DNR that its determination of what is "necessary" is inherently a discretionary decision requiring a "case-by-case analysis" using "its expertise to make fact-specific determinations." *See **Clean Wis.***, 398 Wis. 2d 386, ¶32; *see also* WIS. STAT. § 227.57(8). B&D has failed to adequately explain why the DNR's determination that groundwater monitoring is necessary constitutes reversible error under § 227.57(8), other than to argue that "there is no evidence in the record from a groundwater monitoring well that indicates an exceedance of groundwater protection standards caused by [B&D's] operations." This argument is actually one that the DNR's decision to issue the permit conditions is not supported by substantial evidence, *see* § 227.57(6), which we review in the next section of this opinion.

¶27   B&D also argues that the DNR was required to consider the other "regulatory options" listed under WIS. ADMIN. CODE § NR 140.26(2)(a) in order "to lawfully respond to an exceedance of a numeric groundwater protection standard."   B&D asserts that the other options listed therein "were more appropriate for [the DNR] to explore in the context of this case before, or as an alternative to, ordering implementation of an expensive site-wide groundwater monitoring program that may not be necessary."

¶28   We agree with the DNR's assertion that B&D has provided "no authority for its suggestion that the [DNR] should have favored one response over another to avoid 'expensive' alternatives."   *See **Pettit***, 171 Wis. 2d at 646-47. B&D similarly fails to explain why or how the application of WIS. ADMIN. CODE § NR 140.26(2)(a) would limit the DNR's authority to impose groundwater monitoring under WIS. ADMIN. CODE § NR 243.15(7).   *See **Pettit***, 171 Wis. 2d at 646-47.   We also again note that the DNR's decision to issue a WPDES permit with conditions requires the agency to conduct a "case-by-case analysis," which "allows the DNR to use its expertise to make fact-specific determinations and gives it the flexibility to prescribe conditions that are specifically tailored to a particular applicant." ***Clean Wis.***, 398 Wis. 2d 386, ¶32.

¶29   Given the foregoing, the DNR did not exceed its authority by requiring, as conditions to B&D's WPDES permit, groundwater monitoring, and the ALJ did not incorrectly interpret that authority.   The DNR's authority to impose the groundwater monitoring conditions is expressly provided under WIS. STAT. § 283.31.

### III. Substantial evidence

¶30 Finally, B&D contends that the ALJ's decision upholding the groundwater monitoring conditions is not supported by the requisite "substantial evidence" because the drinking water well was "not a reliable indicator of groundwater quality," and the water quality results from the other wells on B&D's property demonstrate that it is in compliance with groundwater quality standards. B&D's overall argument in this context is that the DNR's actions in this case "border[] on bad faith and regulatory harassment."

¶31 However, the record supports the ALJ's factual determinations underlying its decision to uphold the groundwater monitoring permit conditions. In other words, a reasonable person could have found that the nitrate levels detected on B&D's property were "significant" and "indicat[ed] that the groundwater ha[d] been contaminated"; that the significant nitrate levels would "not occur without a source of contamination"; and that the soils underlying B&D's property would not protect the groundwater from nitrate contamination.

¶32 B&D does not dispute that the DNR detected nitrate levels on B&D's property that exceeded the enforcement standard under WIS. ADMIN. CODE ch. NR 140. The DNR presented substantial evidence to support its findings, which the ALJ credited. Further, the ALJ credited the testimony of several DNR employees who stated that the nitrate levels indicated groundwater contamination and that the source of the nitrate was likely from B&D's operations. For example, William Phelps, *see supra* ¶6, opined that "[n]itrogen generally occurs in high concentrations in liquid wastes produced by CAFOs, with the most common liquid waste being animal manure and process wastewater." Phelps stated that "where oxygen is available," the nitrogen from liquid waste will "likely" be "converted to

the nitrate form of nitrogen, which is very soluble and very mobile in the subsurface." He added that "[w]hen liquid waste containing nitrogen is released on the ground surface, or directly into the subsurface from storage, nitrogen can leach downward and pollute groundwater," particularly where the soil has "relatively high permeability" like at B&D's facilities. Catherine Wunderlich, the DNR's public water engineering section chief, testified that "any nitrate result over 4 mg/L is not natural, so the results … above 20 and 18" mg/L were of "grave concern[] for public health and safety." Accordingly, Wunderlich stated that it was crucial to determine the source of the nitrate contamination.

¶33 B&D contends the ALJ's finding that the nitrate levels indicated groundwater contamination and that the source of the nitrate was likely from B&D's operations are not supported by substantial evidence because the drinking water well had several deficiencies. Specifically, B&D cites the testimony and opinions of Michael Sklash, an expert witness for B&D. Sklash submitted written testimony stating that the drinking water well's "annular seal" consisted of "drill cuttings" instead of Portland cement; that the well extended "only to the bedrock surface, not into the bedrock"; and that a pressure tank connected to the well was rusted, had holes in it, and the welded connection between the well casing and pressure tank was not water tight (a fact testified to by B&D's owner who was present during the removal process). Sklash also testified that multiple disturbances to the soil around the pressure tank altered the permeability of the soil and that a reinstalled electrical conduit was "undoubtedly encroaching into the well seal."

¶34 Sklash argued that these disturbances created a "bathtub effect," which he illustrated in a sketch of the drinking water well, whereby the depression of the soil above ground allowed surface water to pond around the well casing

after a storm or snowmelt. Sklash concluded that these issues created two "ways in which surface water could short circuit"[7] and cause the high nitrate readings. First, "surface water could infiltrate and enter the pressure tank and move inside the well casing." Second, "the pressure tank could cause an interruption in the annular seal on the outside of the well casing."

¶35 B&D's argument that the drinking water well was an unreliable source for groundwater testing essentially asks us to reweigh the evidence presented below and find that B&D's witnesses were more credible and more qualified than the DNR's witnesses. However, "[r]eweighing the evidence is not part of the substantial evidence test." *AllEnergy Corp. v. Trempealeau Cnty. Env't & Land Use Comm.*, 2017 WI 52, ¶117, 375 Wis. 2d 329, 895 N.W.2d 368; WIS. STAT. § 227.57(6). "[T]he weight and credibility of the evidence are for the [ALJ], not the reviewing court, to determine." *Pages Homeowners' Ass'n*, 293 Wis. 2d 1, ¶25 (citation omitted).

¶36 The ALJ determined that the DNR's witnesses were more credible and that the evidence presented by those witnesses supported a finding that the drinking water well was a reliable source for determining that the nitrate levels were higher than permitted by WIS. ADMIN. CODE ch. NR 140. Wunderlich stated in pre-written testimony that the short-circuit theory was unlikely as applied to the drinking water well in this case. Wunderlich stated various reasons for this conclusion, including that the pressure tank was installed in accordance with

---

[7] Wunderlich stated that short-circuiting occurs when "surface water … tak[es] a 'short-cut' to groundwater" rather than "by infiltration through soil."

relevant regulations and that such tanks are not uncommon for production wells and are allowed under Wisconsin law.

¶37 In addition, Wunderlich stated that the tank appeared "to be intact and in a reasonable condition" and that if the tank had holes in it, she would not have expected it to have been operational. Wunderlich added that some rust on the outside of the tank is expected, but the tank was constructed of thick steel "to allow for expected surface rust without compromising the structural integrity of the tank." Further, Wunderlich stated that the damaged, welded connection between the well casing and pressure tank likely occurred when the tank was removed from the ground, and she provided mathematical calculations supporting this reasoning. Moreover, Wunderlich concluded that even if the weld had a structural deficiency, based on the depth of the groundwater and the shape of the pressure tank, "there would not be hydrostatic pressure present to cause water infiltration into the well casing.… Any surface water infiltration through the … soil zone would continue to move vertically down to the groundwater table."

¶38 Regarding the depth of the drinking water well, Wunderlich stated that the shallower positioning of the well "would not be a cause for short-circuiting in" the well. She explained,

> If groundwater is contaminated with nitrate from activities at the surface, a well with shallower well casting depth would pick up elevated nitrate concentrations sooner than a deeper well cased further into the bedrock. This is not short-circuiting; it is simply that the well is drawing from the shallow groundwater.

Wunderlich also stated that Sklash's sketch of the depressions surrounding the drinking water well was inaccurate in multiple ways. For example, applicable

regulations require a slope away from such wells, and there was no evidence of a depression in this case. She also testified that drill cuttings for annular seals are water-tight and are permitted by regulation, given the drinking water well's shallow depth.

¶39 Furthermore, Phelps' stated that the soils underlying B&D's property were sandy and relatively permeable, which corroborated the conclusion that nitrate had entered the groundwater as a result of B&D's activities in the production area, specifically the produced animal waste. Again, the ALJ credited Phelps' and Wunderlich's testimony. Conversely, the ALJ expressly rejected Sklash's testimony, finding that "[m]ultiple DNR witnesses were more credible" and "reliable," particularly Wunderlich, due to her familiarity with the "design and regulation" of the drinking water well. Despite evidence to the contrary raised by B&D, a reasonable person could reach the same conclusion as the ALJ that the drinking water well was a reliable source for determining that the nitrate levels were higher than those permitted by WIS. ADMIN. CODE ch. NR 140. *See **Clean Wis.**, 282 Wis. 2d 250, ¶46.

¶40 B&D also argues that even if the record supports the ALJ's finding that "groundwater impact is present beneath" B&D's property, the record does not support a finding that "geologic or construction conditions warrant monitoring." *See* WIS. ADMIN. CODE § NR 243.15(7). B&D asserts that the ALJ incorrectly credited the DNR's finding that the soils underlying B&D's property were sandy and relatively permeable. B&D cites its experts' opinions for the conclusion that the record shows the "soils are of low to moderate permeability, and are not 'sandy,' but are 'silty sands.'" It also argues that "sandy" is not a descriptive scientific definition of a soil type recognized by the "Unified Soil Classification System."

19

¶41   Again, B&D's argument essentially asks us to reweigh the evidence, something we cannot do.  *See AllEnergy Corp.*, 375 Wis. 2d 329, ¶117; WIS. STAT. § 227.57(6).  Phelps stated that the soil underlying B&D's property is "underlain with permeable, sandy soils, making it susceptible to groundwater contamination."  According to Phelps, "[s]andy soils have relatively high permeability."  He noted that there does not appear to be "any contiguous layer of clay present in the unconsolidated material above bedrock" and reports "show that highly heterogenous deposits of unsorted, unlayered unconsolidated soils," which are "typical of glacial till deposits," "are present above bedrock at the B&D" property.  Phelps reached his conclusion about the soils underlying B&D's property based, in part, on a "Marinette County (USGS) Groundwater Contamination Susceptibility" report, which identified all of Marinette County as having either high permeability soils, medium-high permeability soils, or medium permeability soils, although the report stated that it could not be used for site-specific determinations.  Phelps also stated that he based his conclusion on "logs from soil borings and test pits" from the B&D production site, well construction reports, and his "knowledge of the geology and hydrogeology of northeast Wisconsin."  Again, despite evidence to the contrary raised by B&D, a reasonable person could reach the same conclusion as the ALJ that geologic conditions warrant monitoring due to the type of soils beneath B&D's property. *See Clean Wis.*, 282 Wis. 2d 250, ¶46.

¶42   Although B&D argues that the DNR is treating it unfairly, the essential question in this case is whether the DNR acted within its authority.  The record supports the ALJ's findings that unlawful nitrate levels were present on B&D's property and that geologic conditions—here, high soil permeability— warranted groundwater monitoring.  A reasonable person could reach this same

determination.[8] *See* ***Clean Wis.***, 282 Wis. 2d 250, ¶46. For the reasons explained in the previous section, the ALJ's findings are legally sufficient for the DNR to impose the groundwater monitoring permit conditions under WIS. ADMIN. CODE § NR 243.15(7).

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.

---

[8] Because we conclude that the ALJ's finding that the geologic conditions warrant groundwater monitoring permit conditions is supported by substantial evidence, we need not consider whether "construction conditions" also warrant monitoring. *See* WIS. ADMIN. CODE § NR 243.15(7).